**COPY**

1  STEVEN T. GUBNER - Bar No. 156593
   LARRY W. GABRIEL – Bar No. 68329
2  NICHOLAS A. ROZANSKY - Bar No. 219855
   EZRA BRUTZKUS GUBNER LLP
3  21650 Oxnard Street, Suite 500
   Woodland Hills, CA 91367
4  Telephone: (818) 827-9000
   Facsimile: (818) 827-9099
5  sgubner@ebg-law.com
   lgabriel@ebg-law.com
6  nrozansky@ebg-law.com

7  Attorneys for Plaintiff
   JONATHAN D. ROSE, M.D., PH.D.
8

FILED
CLERK, U.S. DISTRICT COURT

SEP 22 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

9              UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11  JONATHAN D. ROSE, M.D., PH.D.,      Case No. CV11-7838-DDP
    an individual,                               (AJWx)
12
              Plaintiff,              COMPLAINT FOR:
13
         v.                          1.   FRAUD
14                                   2.   FRAUD
    MICHAEL ENRIQUEZ, an individual,  3.   CONSPIRACY TO COMMIT
15  JESUS ENRIQUEZ, an individual,         FRAUD
    MPD MANAGEMENT, INC., a          4.   VIOLATIONS OF THE
16  Nevada corporation dba LHOP            RACKETEER INFLUENCED
    CONSULTING, KIM MIZUNO, an            AND CORRUPT
17  individual, and DOES 1-10, inclusive.  ORGANIZATIONS ACT
                                          (RICO) 18 U.S.C. §§ 1961-1968
18            Defendants.              5.   AIDING AND ABETTING
                                          FRAUD
19                                   6    BREACH OF FIDUCIARY
                                          DUTY
20                                   7.   CONVERSION
                                     8    MONEY HAD AND RECEIVED
21
                                     DEMAND FOR TRIAL BY JURY
22

23      Plaintiff, Jonathan D. Rose, M.D., Ph.D. based upon his own personal

24  knowledge and the investigation of his counsel and upon reasonable inquiry as

25  required by Federal Rules of Civil Procedure, Rule 11, alleges as follows:

26

27

28

1

CASE NO.

## I.   **INTRODUCTION**

By this action, Plaintiff, a lifelong student and intellectual,[1] seeks to recover over $3 million he lost as a result of a "confidence scheme" he fell victim to at the hands of the Defendants, who, in 2008, induced the Plaintiff to become an investor in what was purported to be a start-up internet dating service.   The "business opportunity" was a ruse and nothing more than a part of a scam perpetrated by a convicted felon, who, after Plaintiff's initial investment, further induced Plaintiff to give Defendants significant sums of money, preying on the Plaintiff's compassion, honesty, credulity and to a large degree, naiveté. Defendants perpetrated the fraud by ingratiating themselves to the Plaintiff, by making promises to use their purported business and political connections to further his intellectual pursuits, and by intimidating the Plaintiff with implied threats of violence, relating stories to him of what had happened, or would happen, to people who cross them.   The scam included the use of interstate commerce, mail fraud, and wire fraud.   As more particularly described herein Defendants' acts and conduct encompasses violations of 18 U.S.C.§§ 471, 472, and 473 (relating to counterfeiting), §§ 891–894 (extortionate credit transactions), §1028 (fraud and related activity in connection with identification documents), §1341 (mail fraud), §1343 (wire fraud), §1344 (financial institution fraud), §1951 (interference with commerce, robbery, or extortion), §1952 (racketeering), §1957 (engaging in monetary transactions in property derived from specified unlawful activity), and violations of §1960 (relating to illegal money transmitters), among other violations of the law.

## II.   **JURISDICTION AND VENUE**

1.   This Court has jurisdiction over the instant matter in that the matters giving rise to the claims asserted herein involve federal questions of law. 28 U.S.C. § 1331, 28 U.S.C. § 1357 based upon violations of The Racketeer Influenced and

---

[1] Dr. Rose received his B.S. in electrical engineering, followed by his M.D. from Rush Medical College, and a Ph.D. in biochemistry and molecular biology from Medical College of Ohio at Toledo.  Moreover, he received his M.S. in electrical engineering and B.A. in chemistry.  He is currently working towards his masters in forensic sciences, has completed his first year of law school, and plans to complete his J.D.

CASE NO.

1  Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (2000 ed. and Supp. III),

2  § 1964(c) in particular.

3      2.      Venue is appropriate in this District in that a substantial part of the events

4  or omissions or injuries giving rise to the claims asserted herein occurred in this

5  judicial district, and the Defendants and their agents transact their affairs in this

6  District.  18 U.S.C. § 1965(a).

7  **III.**   **PARTIES**

8      **A.**    **Plaintiff**

9      3.      Plaintiff, Jonathan D. Rose, M.D., Ph.D. ("Plaintiff" or "Dr. Rose") is an

10  individual who resides in the County of Los Angeles, State of California.

11      **B.**    **Defendants**

12      4.      Defendant Michael Enriquez is an individual who resides in the County

13  of Los Angeles, State of California. Michael Enriquez is or was, at all times relevant,

14  the President of Defendant MPD Management, Inc.

15      5.      Defendant Jesus Enriquez is an individual who resides in San Antonio,

16  Texas, and is the brother of Michael Enriquez.  Jesus Enriquez is or was, at all times

17  relevant, the Treasurer of Defendant MPD Management, Inc.

18      6.      Defendant MPD Management, Inc. is a Nevada corporation doing

19  business as LHOP CONSULTING ("MPD"), doing business at 2505 Anthem Village,

20  Henderson, Nevada, 89052.  MPD's business purpose is unknown.

21      7.      Defendant Kim Mizuno is an individual who resides in the County of Los

22  Angeles, State of California.

23      **C.**    **Instrumentalities of the Fraudulent Scheme**

24      8.      The following individuals, corporations and /or business entities, one or

25  more of which were owned and controlled by one or more of the individually named

26  defendants, were used by the individually named defendants and the defendant

27  corporations (collectively, the "Defendants") as instrumentalities in the commission of

28  the Defendants fraudulent scheme as hereinafter alleged:

1        a.     MPD, now suspended, used by Defendants Michael Enriquez,

2                 Jesus Enriquez and Mizuno, as their purported business concern.

3        b.     MJ Moore & Company, LLC, ("MJ Moore") a Nevada accounting

4                 firm used by Defendants as a "funds disbursing agent."

5        c.     Robert Clymer ("Clymer"), an ex-FBI special agent used by the

6                 Defendants to conduct background checks on their target victims

7                 and to add credibility to Defendants' claims

8        d.     Sin City Private Investigators, Inc. Clymer's investigation

9                 company.

10       e.     Model Obsession, a purported agency for models, which in

11                actuality was used as a front for Defendants' "escort" business.

12       f.     Nicole Yawn, ("Yawn") purportedly the live-in friend and/or

13                fiancé of Defendant Michael Enriquez and who befriended Dr.

14                Rose.

15       g.     Jessica Canizales ("Canizales"), purportedly the girlfriend and/or

16                fiancé of Defendant Michael Enriquez.  Canizales received funds

17                from Michael Enriquez through Dr. Rose's American Express and

18                Visa accounts, through her PayPal account.

19       h.     Defendant Kim Mizuno ("Mizuno"), a well-known photographer

20                for Playboy Magazine who is the corporate secretary of MPD.

21                Mizuno is also associated with Model Obsession.

22       i.     MZ Productions, Inc., ("MZ Productions") a California

23                corporation,  owned by Mizuno, and engaged in the business of

24                photographing models.

### D.    Doe Allegations

25

26      9.     The true names and capacities of Defendants, DOES 1-10, inclusive, are

27   unknown to Plaintiff at this time, who therefore sues said Defendants by such

28   fictitious names.  Plaintiff is informed and believes, and thereon alleges, that each

CASE NO.

1    Defendant named as a DOE is responsible for each and every act and/or obligation

2    hereinafter set forth.

3        **E.**    **Alter-ego**

4        10.    Plaintiff is informed and believes, and thereupon alleges, that a unity of

5    interest and ownership exists, and at all times mentioned herein existed, between

6    Michael Enriquez, Jesus Enriquez, Kim Mizuno and/or the fictitiously named

7    defendants on the one hand, and MPD and/or fictitiously named defendants on the

8    other hand, and that MPD and/or fictitiously named defendants are, and at all times

9    herein mentioned were, the alter ego of Michael Enriquez, Jesus Enriquez, and Kim

10   Mizuno such that any individuality and separateness between these parties has ceased

11   and each corporate defendant is the alter ego of each individual defendant.  Because of

12   this, Plaintiff alleges that Michael Enriquez, Jesus Enriquez, Kim Mizuno, and/or

13   fictitiously named defendants are jointly and severally liable for any acts or omissions

14   of MPD Management and/or fictitiously named defendants, including all damages

15   caused thereby. Plaintiff is informed and believes, and thereupon alleges, that

16   adherence to the fiction of the separate existence of the corporate defendant MPD

17   and/or fictitiously named defendants as entities separate and distinct from each

18   individually named and/or fictitiously named defendants including Michael Enriquez

19   and Jesus Enriquez would permit abuse of the corporate privilege and would sanction

20   fraud and promote injustice.

21       **F.**    **Aiders, Abettors, Agents and Co-conspirators**

22       11.    Defendants, and each of them, are individually sued as participants and

23   aiders and abettors in the wrongful activities complained of herein and the liability of

24   each arises from the fact that each Defendant had actual knowledge of the wrongful

25   acts of the each of the other Defendants and engaged in all or part of the improper

26   acts, plans, schemes, or transactions, which operated a fraud against the Plaintiff.

27   Defendants, and each of them, participated as members of the conspiracy or acted

28   with or in furtherance of it, or aided or assisted in carrying out its purposes as alleged

5

1   in this Complaint, and have performed acts and made statements or representations in
2   furtherance of the conspiracy or the fraudulent conduct of the Defendants.

3       12.    At all relevant times, each Defendant was and is the agent of each of the
4   remaining Defendants, and in doing the acts alleged herein, was acting within the
5   course and scope of such agency.   Each Defendant ratified and/or authorized the
6   wrongful acts of each of the other Defendants.

7   **IV.    FACTS COMMON TO ALL CLAIMS FOR RELIEF**

8       **A.    Plaintiff's Background and Experience**

9       13.    Dr. Rose has spent most of his adult life in academic pursuits.   After
10  obtaining his degree in electrical engineering, he furthered his education and
11  intellectual pursuits by going to medical school, obtaining his degree as a doctor of
12  medicine, and a Ph.D. in biochemistry and molecular biology.   He has completed the
13  first year of law school, and is currently working toward a master degree in forensic
14  sciences.   He is a member of numerous professional societies and his appointments are
15  substantial.   Over the years, Dr. Rose has managed to amass substantial savings and
16  income.   Dr. Rose is from a family of considerable note and wealth and is well known
17  in the mid-west area.   Notwithstanding, as more fully set forth herein, in 2008 Dr.
18  Rose fell victim to a "confidence scheme" that would take him for millions of dollars.

19      **B.    Plaintiff's Initial Contact with Defendant Michael Enriquez**

20      14.    In or about December, 2008, Dr. Rose first met Nicole Yawn ("Yawn")
21  at a night club while on a trip to Las Vegas.   Ms. Yawn struck up a conversation with
22  Dr. Rose, and the two exchanged telephone numbers upon learning that they lived
23  near each other in Marina Del Rey, California.   After the exchange of telephone
24  numbers, the two went their separate ways.

25      15.    Within days of his meeting Ms. Yawn, Dr. Rose received a telephone call
26  from Defendant Michael Enriquez (hereinafter "Michael Enriquez"), who indicated
27  that he had obtained Dr. Rose's telephone number from Yawn.   During the telephone
28  call Michael Enriquez represented to Dr. Rose that he was a businessman who was

1   putting together an internet dating website designed for well-to-do men and women,

2   and that he was looking for investors for this business.   During the course of the

3   conversation Michael Enriquez invited Dr. Rose to lunch at the "Pacific Dining Car",

4   an upscale restaurant located in Santa Monica, California, to discuss further his

5   business concept and to determine whether Dr. Rose would be interested in investing

6   in the same.   Intrigued by the proposition, Dr. Rose agreed to the lunch meeting.

7   **C.**   **Defendant Michael Enriquez Approaches Dr. Rose to Invest in his**

8   **Business Ventures**

9   16.   In or about December, 2008, Dr. Rose met Michael Enriquez at the

10   Pacific Dining Car restaurant as previously arranged.   During the course of the lunch,

11   Michael Enriquez represented that he was owner and president of MPD and that

12   through MPD he operated a number of businesses, including but not limited to a

13   modeling agency service and a special events business.   During the course of this

14   meeting Michael Enriquez mentioned that he was in the process of putting together an

15   "on-line" dating service that he referred to as "Jet Set Dating," describing his business

16   concept as a dating service, matching successful men and women together.   Michael

17   Enriquez represented to Dr. Rose that a number of well-known individuals in the

18   modeling business would be involved in this "startup", including Kim Mizuno

19   ("Mizuno"), a "Playboy Magazine" photographer of some renown, an individual by

20   the name of Alex Ardenti – a photographer in the fitness model industry, and an

21   individual by the name of Dan Faiman, an information technology specialist.   Michael

22   Enriquez also represented that he was a 1994 graduate of UCLA (major: Finance) and

23   a member of the "PJ's", a Special Forces parajumper in the U.S. Air Force.   He further

24   represented that he worked on a daily basis with models from Playboy, Penthouse,

25   Elite and Ford modeling management, and that all of these resources would be put to

26   use in his proposed business.   By all appearances, Michael Enriquez was a legitimate

27   businessman looking for an investor or lender.   What was not disclosed to Dr. Rose

28   was that Michael Enriquez was a convicted felon and had previously been convicted

CASE NO.

1   of auto theft, and that he was previously charge with, but not convicted of tampering
2   with Government Records.   Also not disclosed was that Michael Enriquez had
3   recently used another allege start up business concept, "Model Obsessions" to defraud
4   an investment fund manager out of over $300,000, all as is more particularly alleged
5   below.

6   **D.**     **Defendant Michael Enriquez' Efforts to Gain Dr. Rose's Trust and**
7           **Confidence and to Develop a Purported Friendship and Business**
8           **Relationship with Dr. Rose**

9           17.   Shortly after Dr. Rose's initial meeting with Michael Enriquez, and
10  between December, 2008, and January, 2009, Michael Enriquez started taking steps to
11  gain Dr. Rose's trust and confidence and to convince him of his "bona fides" as a
12  legitimate businessman.   Among other things, in or around January 2009, Michael
13  Enriquez delivered to Dr. Rose at his residence in Marina Del Rey, a business plan for
14  a company he proposed to form called Model Obsession, which would provide models
15  with portfolio services which they could use to launch their careers, (a copy of which
16  is attached as Exhibit "1") and described another business he operated that provided
17  models and celebrities for social functions in the South of France and Mediterranean.

18          18.   At or about the same time, Michael Enriquez provided Dr. Rose with
19  bank records for MPD, corporate certificates, personal bank records, and a personal
20  tax return, all of which represented that Michael Enriquez had substantial assets, and
21  by all appearances was a legitimate businessman with sufficient skills and assets to
22  form and manage his various business operations.   On information and belief, the
23  business records were false and fraudulent, and the purported bank records made up
24  by cutting and pasting bank stationary onto various other bank records.   Michael
25  Enriquez also provided Dr. Rose with projections of the monetary return he could
26  expect from his investment in Michael Enriquez business, which projections were
27  significant and indicated a return on investment in excess of 10% per annum. The
28  projections were false and made up without any basis in fact.

CASE NO.

19.   The information presented to Dr. Rose by Michael Enriquez was false and fraudulent as heretofore set forth, and was presented to Plaintiff in order to induce Plaintiff to invest in Michael Enriquez' businesses and further to gain Plaintiff's trust and confidence in order to gain control over the Plaintiff.  Further, the representations contained material omissions of fact.  What Michael Enriquez did not disclose to Dr. Rose was that in 2007-2008, he (using his brother's name, Jesus Enriquez), and Mizuno had used the "Model Obsession" business proposal to induce a New York based investment fund, Diversified Technology Fund, LLC, ("DTF") to give them hundreds of thousands of dollars as a purported investment in the limited liability company, Model Obsession, LLC; and that Michael Enriquez thereafter defrauded DTF by making unauthorized cash withdrawals and funds transfers from Model Obsession's accounts for unauthorized expenditures that bore no relation to the business of Model Obsession; and, that he then attempted to cover up by submitting falsified invoices to DTF's manager who was auditing the expenditures, all as more specifically set forth in paragraphs 48 through 57 below.  Upon information and belief, Michael (Jesus) Enriquez and Mizuno sold this business model, not only to DTF, but also to numerous other "potential investors" with the goal of committing the same type of fraud.

20.   After delivering the business proposal and other financial information to Dr. Rose, Michael Enriquez continued to develop his relationship with Dr. Rose inviting Dr. Rose to various restaurants for dinner meetings, and by confiding in Dr. Rose as to his personal life and issues that purportedly affected his life, including telling Dr. Rose of his personal relationships with his fiancé, and asking for medical advice as to alleged health issues of his mother.  As a result of the meetings and conversations, and based upon Michael Enriquez's representations and presentations, and the personal relationship that Michael Enriquez was able to develop with Dr. Rose, in or around January 2009, Dr. Rose made a loan to Michael Enriquez of $45,000, which Michael Enriquez promised to repay on or before June 9, 2009.

9

Michael Enriquez represented that he was using the money as part of the start-up capital for the "Jet Set Dating" internet business.

21.    In or around February 2009, Michael Enriquez in Los Angeles, California, approached Dr. Rose and suggested that Dr. Rose's loan be turned into an equity investment in his Model Obsession project, offering Dr. Rose a 20% interest in Model Obsession.   Dr. Rose agreed to the proposal and a draft agreement was circulated as between Dr. Rose and Michael Enriquez, but never executed.  A true and correct copy of the draft partnership proposal is attached as Exhibit "2".  At or about the same time, Dr. Rose inquired as to the status of "Jet Set Dating" and was advised by Michael Enriquez that the project was put on the "back burner" so that he could concentrate his efforts on Model Obsession.

22.    On or about March of 2009, Michael Enriquez, while in Los Angeles, contacted Dr. Rose by telephone while Dr. Rose was visiting family in Detroit, Michigan.  Michael Enriquez requested that he and Dr. Rose meet in Detroit to discuss his business operations and further investment opportunities.  Shortly thereafter Michael Enriquez flew out from Los Angeles and met Dr. Rose in Detroit, Michigan where Dr. Rose and Michael Enriquez went to a restaurant in downtown Detroit. During their dinner meeting and thereafter at Michael Enriquez' hotel, Michael Enriquez and Dr. Rose discussed Michael Enriquez' various businesses, and the progress being made on the Model Obsession project.   During the course of their conversations Michael Enriquez represented that one of his business associates who previously provided him funding for one of his special events business, organizing Mediterranean "in season" yacht parties (including providing entertainment, models and actresses), was unable to do so, and inquired as to whether Dr. Rose would be interested in becoming his financial partner in this business venture (the "Mediterranean Event Business").   Michael Enriquez presented Dr. Rose with a precise budget for the Mediterranean Event Business and suggested funding in the form of capital and by establishing credit facilities with American Express and Visa.

Michael Enriquez represented that Dr. Rose would be repaid his principal plus fifty percent of the profits from the Mediterranean Event Business.  Based upon the representations made by Michael Enriquez to Dr. Rose, Dr. Rose agreed to participate in the Mediterranean Event Business, and to provide funding for the business in installment payments, and further to provide a credit facility for the business by establishing accounts under his name with American Express and Visa Credit Cards. The credit limits on each of the accounts was supposed to be $50,000 each.

23.    Also during their meeting in Detroit, Michael Enriquez further represented to Dr. Rose, that there was going to be a Playboy Casting Call and photography shoot ("casting shoot") in Detroit, Michigan in April/May 2009, and that Mizuno would be the photographer for the casting shoot. Michael Enriquez further represented that this would be good opportunity to meet with Mizuno, who was one of the principals of MPD, and further that Mizuno would be willing to take photographs of Dr. Rose's then fiancé, along with her friend.

24.    In reliance upon the oral and written representations made by Michael Enriquez to Dr. Rose as set forth above, on or about February 10, 2009, Dr. Rose issued a $25,000 check to the benefit of MPD, followed up with a $20,000 check to LHOP Consulting on March 9, 2009.  True and correct copies of the two checks are attached as Exhibit "3".

25.    In further reliance upon the oral and written representations made by Michael Enriquez to Dr. Rose as set forth above, on or about March 3, 2009, Dr. Rose (a) set up accounts with American Express, in the name of Dr. Jonathan Rose, Account No. xxxxxxxxxx32005 and with Visa, in the name of Dr. Jonathan Rose, Account No. xxxxxxxxxxx5548; and, (b) issued a wire transfer from his account at Fidelity Bank to an account at Wells Fargo Bank for the benefit of LHOP Consulting (MPD) in the amount of $ 32,000.00.

11

26.     In or around late April, early May, 2009, Dr. Rose and his fiancé met Mizuno and his assistant, at their hotel rooms at the Ritz-Carlton in Dearborn, Michigan. Mr. Mizuno took pictures of Dr. Rose's then fiancé, and at a later date, of Dr. Rose, eventually delivering the pictures to Dr. Rose.   The pictures were of outstanding quality.  Plaintiff is informed and believes that this trip was arranged by Michael Enriquez and Mizuno to demonstrate to Dr. Rose their credibility and to gain Dr. Rose's trust and confidence.    The Playboy casting shoot was purportedly cancelled.  Plaintiff is informed and believes that the Playboy casting shoot was never a scheduled event.

27.     Thereafter, Michael Enriquez continued his efforts to ingratiate himself to Dr. Rose, and to further Dr. Rose's trust and confidence in him.   Among other things, Michael Enriquez preyed on Dr. Rose's desire to further his forensic sciences work toward his master's degree, orally representing to Dr. Rose  that he was personally acquainted with a number of individuals who had high-ranking positions in the White House who would vouch for Michael Enriquez, and who he could contact in order to facilitate Dr. Rose's acceptance into the Special Deputy Program of the US Marshal Service for a two-week training at the Federal Law Enforcement Training Center ("FLETC") at Glynco, Georgia; and, that he could provide access to other government law enforcement training.[2]  Michael Enriquez supported his representations of his political "clout" by presenting Dr. Rose with souvenirs with the Presidential Seal affixed to them that he purportedly received from White House personnel, and with certificates of recognition purportedly signed by the President. Dr. Rose also received telephone calls and messages, purportedly from high ranking White House officials advising him of their relationship with Michael Enriquez. Michael Enriquez also promised Dr. Rose that he could arrange a fellowship position at the Armed Forces Institute of Pathology, a medico-legal death consulting position in connection with the cause of the death of performer Michael Jackson, civilian flight

---

[2] Michael Enriquez represented to Dr. Rose that he would be training alongside a Federal Judge and a Michigan legislator while at Glynco.

CASE NO.

surgeon training at a Texas Air Force base, and 500 hours training interval with the Behavioral Science Unit at the FBI-Quantico, usually reserved for senior FBI agents but which can be made available to state, local, and international law enforcement personnel with the correct sponsorship.

28.     To further his credibility with Dr. Rose, Michael Enriquez introduced Dr. Rose to his investigator, Robert Clymer, who, in conversations with Dr. Rose, validated much of what Michael Enriquez had said to Dr. Rose, and vouched for his ability to deliver on his promises.  Clymer also promised to provide Dr. Rose with an internship with his company, Sin City Private Investigators which Dr. Rose could use as credit toward his masters in forensic sciences.  None of the promises as set forth in paragraph 27 above ever came to fruition despite detailed written and oral communications on schedules and descriptions.  Each of the oral and written representations and promises, although justifiably relied upon by Dr. Rose, were complete  fabrications designed to ingratiate Michael Enriquez to Dr. Rose, and to make Dr. Rose vulnerable to Michael Enriquez's requests for money.

29.     In addition, Michael Enriquez arranged for Dr. Rose to meet and have dinner dates with a variety of models and actresses. Michael Enriquez manipulated these dates by having the models and actresses arrive at the restaurant in limousines and on one occasion, in a Bentley automobile.  However, unbeknownst to Dr. Rose, Michael Enriquez was using Dr. Rose's credit card to pay for the transportation provided to the various women.  The dates always ended at the conclusion of the dinner, with the model/actress leaving the restaurant via the limousine and Dr. Rose returning to his condominium.

30.     In or about May, 2009, at Los Angeles, California, Dr. Rose was introduced to Defendant Jesus Enriquez by Michael Enriquez.  Jesus Enriquez is the brother of Michael Enriquez.  Jesus Enriquez was a part of the Jet Set Dating and an officer of MPD.

31.   In or about June, 2009, Michael Enriquez had a series of telephone conversations and dinner meetings with Dr. Rose in Los Angeles, California, regarding Dr. Rose's investment in Jet Set Dating, Model Obsession and the Mediterranean Event Business, during which time Michael Enriquez described the status of the business, the progress being made in putting the business together and further discussed his other businesses, all with reports on the financial success of each of the businesses.

32.   Between June 2009 and December 2009, Defendants Michael Enriquez and Jesus Enriquez continued to develop their relationship with Dr. Rose by continuing to advise him of the purported status of the business operations and the success of the same, by inviting Dr. Rose to dinners, by continuing to tell Dr. Rose of their personal problems and issues, and by continuing to seek his advice and counsel as to their mother's purported medical conditions.   At the same time, Michael Enriquez continued to advise Dr. Rose that he needed additional funding for the Model Obsession and for the Mediterranean Event Business because of growth issues, and solicited additional funding for the same.

33.   Between April 2009 through December 2009, Dr. Rose issued wire transfers from his account at Fidelity Bank to an account at Wells Fargo Bank for the benefit of LHOP Consulting on the dates and in the amounts set forth below:

| Date | Amount |
| --- | --- |
| April 7, 2009 | $   22,000.00 |
| April 15, 2009 | $   85,000.00 |
| April 27, 2009 | $ 110,000.00 |
| May 11, 2009 | $ 117,000.00 |
| May 27, 2009 | $   88,000.00 |
| June 12, 2009 | $     6,000.00 |
| July 30, 2009 | $   35,000.00 |
| August 13, 2009 | $   35,000.00 |

14

| September 1, 2009 | $ 30,000.00 |
| September 11, 2009 | $ 25,000.00 |
| October 22, 2009 | $ 24,000.00 |
| December 16, 2009 | $ 27,000.00 |
| December 21, 2009 | $ 17,500.00 |

34.     In or around December, 2009, Defendant Michael Enriquez had so ingratiated himself to Dr. Rose, that Dr. Rose accepted an invitation to spend the Christmas holiday with the Enriquez family in San Antonio, Texas.  In attendance were Michael Enriquez's mother (Andrea Mata), his brother, Jesus Enriquez and his wife and step son.   Also in attendance was Michael Enriquez' "fiancé" Jessica Canizales, and one of his uncles.  At this holiday event, Michael Enriquez enticed Dr. Rose to go with him to London England, based upon his representation that the purpose of the trip was to meet with individuals who purportedly were going to be additional investors, or otherwise involved  in Model Obsession, Inc. and "Jet Set Dating."  Dr. Rose agreed to the trip as (a) he had never traveled outside of North America, and (b) was intrigued by the possibility of meeting other investors of Michael Enriquez's, and the possibility of making business contacts that could further his business and career goals.

35.     The trip to London took place right after the 2009 Christmas Holiday. The purported investors never arrived for the meeting(s), purportedly due to inclement weather in London.  The entire trip, including the flights, hotel bills and dinners were paid for by Dr. Rose, through the use of his American Express and Visa credit cards. In addition, while at Heathrow Airport, Dr. Rose and Michael Enriquez had a chance meeting with Jermaine Jackson, Michael Jackson's brother.   Jermaine Jackson immediately struck up a conversation with Michael Enriquez, and by all appearances and based upon their conversation, caused Dr. Rose to believe that Michael Enriquez and Jermaine Jackson were well acquainted.  This "meeting" further appeared to

CASE NO.

validate Michael Enriquez' representations as to his business and contacts in the entertainment industry.

36.    At or about the same time (2009-2010), Dr. Rose was engaged in negotiations with administrators at the Cedars-Sinai Medical Center ("CSMC") in Los Angeles regarding Dr. Rose's eligibility to sit for his Board Certification examination. Dr. Rose discussed the issues he was having with CSMC with Michael Enriquez, who represented that he knew someone that used to be on the Board at CSMC, had retired, and that his son was now on the board.  Michael Enriquez indicated that he could take care of Dr. Rose's problem with a phone call.  He thereafter advised Dr. Rose that he called the person and was told that an agreement would be reached whereby CSMC would certify Dr. Rose as "Anatomic Pathology Board Eligible" and that he would be granted a *non-voting* position on the Board at CSMC.  This later turned out to be false, and in fact, Michael Enriquez never arranged for any agreements or understandings with CSMC.

37.    Between January 1, 2010, through January 2011, Dr. Rose, based upon the written and oral representations of Michael Enriquez that all funds Dr. Rose was providing to him were being use to further their business interests, wire transferred additional funds from his Fidelity Account in Michigan to the LHOP Consulting account at Wells Fargo Bank, in Las Vegas, Nevada, on the dates and in the amounts as follows:

| Date | Amount |
|---|---|
| March 1, 2010 | $   52,500.00 |
| July 13, 2010 | $ 100,000.00 |
| July 19, 2010 | $     4,000.00 |
| July 28, 2010 | $   32,000.00 |
| August 6, 2010 | $   25,000.00 |
| September 9, 2010 | $   40,000.00 |
| September 13, 2010 | $   20,000.00 |

CASE NO.

| September 16, 2010 | $ 50,000.00 |
|---|---|
| October 21, 2010 | $ 4,000.00 |
| November 10, 2010 | $ 88,500.00 |
| January 11, 2011 | $ 4,000.00 |
| January 14, 2011 | $ 4,000.00 |
| January 24, 2011 | $ 22,000.00 |

In total, between March 3, 2009 through January 24, 2011, Dr. Rose wired transferred from his Michigan Fidelity Account to the account of LHOP Consulting account at Wells Fargo Bank, Nevada, $1,099,000.  True and correct copies of the wire transfers reports are attached hereto as Exhibit "4", with redactions of Dr. Rose's personal information only.  None of this money was used for its intended business purpose.

38.    In or around December 2010, Dr. Rose made demand on Michael Enriquez to return the money he had given to him.  In response, Defendant Michael Enriquez orally represented to Dr. Rose, that (a) his money was being put to a legitimate use in support of Michael Enriquez' businesses, (b) that Dr. Rose's money was secure and that payment would be made from a Swiss Bank Account that listed Dr. Rose as a beneficiary.   In support of his representations, Michael Enriquez presented Dr. Rose with a written account statement for the purported account, which represented an account balance of $28,383,700.32. A true and correct copy of the account statement is attached hereto as Exhibit "5", with the names of the transferors redacted to protect their privacy.   In fact and in truth, Michael Enriquez' representations as to the Swiss Bank Account, the account statement and the balances in the purported Swiss Bank Account were false and fraudulent; and, upon information and belief, the documents purporting to be the account statement for the Swiss Bank Account is a document generated by Michael Enriquez to convince Dr. Rose of the legitimacy of his business operations, and that the money he invested

17

1  and/or advanced to Defendant Michael Enriquez would be repaid.

2        39.    In further response to Dr. Rose's demands for repayment, in or around

3  February 2011, Michael Enriquez represented to Dr. Rose that he was in the process

4  of arranging a wire transfer of $2 million from the Swiss Bank Account to the account

5  of and for the benefit of Dr. Rose.  In furtherance of this representation, on or about

6  February 14, 2011, Dr. Rose received a letter via email on the letterhead of a Las

7  Vegas, Nevada, accounting firm, MJ Moore & Company, LLC., confirming that MJ

8  Moore had been engaged to handle "the domestic disbursement of an international

9  wire transfer expected to settle into one of MJ Moore's disbursement accounts at

10  Wells Fargo Bank, N.A. within the next several days," and that the anticipated amount

11  of the wire was $2.2 million.  Further, the letter represented that MJ Moore had been

12  instructed that upon receipt of the funds, to transfer the same to Dr. Rose's account at

13  Fidelity Bank, in Allen Park, Michigan, and that the funds were expected no later than

14  Friday February 18, 2011.  A true and correct copy of the letter is attached as Exhibit

15  "6".  The promised funds (in any amount whatsoever) were never received.

16      **E.**    **Defendants Unauthorized Use of Dr. Rose's Banking Account**

17        40.    In addition to the money Dr. Rose wire transferred from his Fidelity

18  Account to LHOP Consulting, at least five unauthorized transfers were made from Dr.

19  Rose's Fidelity Account to Visa. Dr. Rose is informed and believes, and based thereon

20  alleges, that Michael Enriquez used a computer to hack into Dr. Rose's account to

21  effectuate the transfers, and to request and obtain additional credit limits (up to

22  $100,000) on Dr. Rose's Visa account. The unauthorized transfers were made on the

23  dates and for the amounts as set forth below:

24  ///

25  ///

26  ///

27  ///

28  ///

CASE NO.

| January 27, 2010 | $21,866.55 |
| February 17, 2010 | $10,000.00 |
| February 23, 2010 | $10,000.00 |
| March 3, 2010 | $15,000.00 |
| March 16, 2010 | $20,000.00 |

In total, Dr. Rose has identified $76,866.55 in unauthorized transfers by Michael Enriquez from Dr. Rose's Fidelity Account to Visa.

**F.**     **Defendants Unauthorized Use of Credit Cards And Dr. Rose's Total Loss From the Fraud**

41.     Between March 3, 2009, through February, 2011 Defendants Michael Enriquez and Jesus Enriquez accessed Dr. Rose's American Express and Visa accounts which Dr. Rose had established to provide financing for the Mediterranean Event Business and which charges were to be limited solely for business purposes, and generated unauthorized charges against the accounts in the amount in excess of $2,385,400.

42.     An audit of the American Express and Visa account statements indicates that most if not all of the charges were used by Defendants Michael Enriquez and Jesus Enriquez for their own personal benefit and extravagant life styles, which display was further used to influence Dr. Rose and to provide the appearance that Defendants Michael Enriquez and Jesus Enriquez were successful business operators and that they had substantial wealth and resources. In fact and in truth, Defendants Michael Enriquez and Jesus Enriquez were using Dr. Rose's money and credit to support their extravagant life styles and to purchase luxury items and jewelry (in an amount in excess of $900,000) and to pay for luxury automobiles that Defendants leased without consent or authorization; and, for further personal expenses contrary to their agreement to limit all charges to appropriate and necessary business expenses. More specifically, Defendants Michael Enriquez and Jesus Enriquez spent over

$150,000 at Watches of Switzerland in London, $100,000 on luxury car leases, $20,000 at Louis Vuitton, $12,000 at Barneys New York, $11,000 at Watch Empire, and $9,000 at Hermes.   Additionally, Defendants spent over $200,000 on PayPal transactions, which included transfers of money to Canizales, as well as Sin City Private Investigators.  The credit cards were not used pursuant to the authority granted by Dr. Rose, who was repeatedly assured by Michael and Jesus Enriquez that the cards were being used solely for business purposes, for example, to get their various business ventures off the ground.

43.    In total, between December 2008, and January 2011, Defendants purloined from Dr. Rose $3,606,267.54. as follows:

      a.  Checks payable to MPD and LHOP:  $45,000.00;

      b.  Wire Transfers to LHOP Consulting: $1,099,000.00;

      c.  Charges against American Express Account: $1,891,820.00;

      d.  Charges against Visa Account:  $493,580.99;

      e.  Unauthorized Transfers from Fidelity to Visa: $76,866.55.

      Total Loss:                              $3,606,267.54.

## G.    Defendants Acts of Threats and Intimidation

44.    Throughout 2010 Dr. Rose questioned when he could expect a return on his investments and repayment of the loans he made to the Defendants; and, as set forth above, in or around December, 2010, began to demand repayment for the monies he had invested in Michael Enriquez' business enterprises and those monies that he advance by way of loans to Defendants Michael Enriquez and Jesus Enriquez.

45.    In response to the questions and demands, Michael Enriquez told Dr. Rose that the probability that any of his money being returned would be significantly diminished if he stopped continuing to provide funding to Michael Enriquez for his business purposes.  Michael Enriquez also continually and repeatedly assured Dr. Rose that he "would make him whole."  When confronted with the massive charges on his credit cards that did not have any connection to any legitimate business

purpose, Michael Enriquez told Dr. Rose that the charges were the result of a fraud on him, that American Express was auditing the charges, that the charges were being reversed, or that the charges were going to be "charged-back." Later, when Dr. Rose asked American Express representatives if any of Michael Enriquez's representations were true, the representatives denied having any information about the claims Michael Enriquez stated existed and/or were being pursued.

46.     Michael Enriquez also advised Dr. Rose that he was highly "connected" and was not to be crossed. As set forth above, Michael Enriquez represented that he had relationships with various high-ranking White House officials and that if Dr. Rose wanted any positions with the government he should go along with his business operations, and his financial requests. As set forth above, Mr. Clymer corroborated most of Michael Enriquez's claims regarding his relationships and access to governmental institutions and training facilities.

47.     Michael Enriquez further told Dr. Rose of an individual who had once supposedly crossed him, and he turned that person into a "vegetable" following a "severe beating;" and, of a one-time high profile Madame who had spilled secrets regarding prostitution to Vanity Fair Magazine, and who would likely meet her end with a bullet while dining at a cafe. He further advised Dr. Rose that he had a gun collection, and during the Texas trip took Dr. Rose to a gun range to demonstrate his abilities to shoot a gun.

## H.     Claims of Fraud and Deceit and Other Predicate Acts by Defendants as to Other Investors – Diversified Technology Fund, LLC

48.     As set forth in the introduction to this complaint, Dr. Rose is not the only victim of the Defendants' fraud and deceit. Prior to meeting Dr. Rose in 2008, the Defendants used their "Model Obsession" business concept to induce investors in a formally organized investment fund, Diversified Technology Fund, LLC., ("DTF") to give the Defendants over $300,000, which the Defendants then used not for the business of "Model Obsession" but for their own personal benefit and to support their

CASE NO.

lifestyles, all as set forth in paragraphs 49 through 57 below.

49. In or around May 2007, Michael Enriquez (using his brother's name, Jesus Enriquez) and Kim Mizuno approached a Bryan Caisse ("Mr. Caisse"), the manager of DTF, to solicit an investment opportunity in their business concept, Model Obsession. During this meeting and in subsequent meetings, Michael Enriquez and Mizuno provided Mr. Caisse with a business plan (believed to be the same business plan provided to Dr. Rose) than demonstrated the potential for success and growth of Model Obsessions. Based thereon, and upon further conversations Mr. Caisse had with Michael Enriquez and Mizuno, Mr. Caisse and DTF agreed to form Model Obsession, LLC with Michael Enriquez and Mizuno. The Model Obsession, LLC Operating Agreement contained multiple provisions regarding each member's contributions to Model Obsession, LLC as well as provisions relating to the use and control of Model Obsession's capital resources. A copy of the Model Obsession LLC agreement is attached as Exhibit "7".

50. Pursuant to the Model Obsession Operating Agreement, each member pledged to make contributions into Model Obsession to facilitate its growth and success. DTF pledged to contribute an initial fifty-thousand dollars ($50,000.00) to Model Obsession, and to make subsequent contributions, on a monthly basis, of the amount of money necessary to meet the monthly budget for the first six (6) months of operation, on the basis that no payment of dividends would be made to any class of shareholders during the first six months of operations, and all income would be used to pay Model Obsession's budgeted expenses as described in a budget the parties had agreed to for the operation of the business (the "Initial Budget"). Furthermore, to the extent additional funds were needed to meet the requirements of the Initial Budget, DTF agreed to provide those funds.[3]

51. Mizuno agreed to contribute all of his rights in all pictures, electronic images, drawings or other representations of the human body ("Images") made the

---

[3] Operating Agreement, ¶ 10(a).

CASE NO.

Model Obsession, and agreed to permanently and irrevocably relinquish all personal rights thereto, including all future royalty streams therefrom.  Mizuno also contributed the model paysites and "rookie camp" currently possessed and operated by MZ Productions.  Furthermore, Mizuno agreed that he would not setup or work for any websites which broadcast Images on the internet or undertake activities which compete with Model Obsession in any way, except that Mizuno could continue to produce Images for Playboy, which would be governed by the agreement between Mr. Mizuno and Playboy.  Finally, the parties agreed that Mizuno could continue to produce calendars for MZ Productions and use the MZ Productions website to present his portfolio so long as MZ Productions was prohibited from becoming an internet pay-site in the future.[4]

52.    Michael Enriquez agreed to contribute his time, expertise, connections in the industry, and use of his house on an ongoing basis to the Company.  Michael Enriquez also agreed not to acquire an interest in or become involved in the management of any enterprise, other than the Model Obsession, which produces or distributes Images anywhere in the world.   To the extent that Michael Enriquez already possessed any such interests, he agreed that he would divest himself of such interests prior to formation of Model Obsession, or that he would contribute all such interests he retained to Model Obsession.[5]

53.    The Operating Agreement also provided strict controls over budgets, business plans and discretionary spending, all of which had to be submitted to and approved by a majority of the Board of Directors and Class A and B Shareholders. Specifically, any discretionary expenditure over five thousand dollars ($5,000.00) had to be approved by the majority of each of the Class A and B Shareholders, and the aggregate unbudgeted discretionary spending for any year was not to exceed twelve thousand dollars ($12,000.00).[6]

---

[4] Operating Agreement, ¶ 10(b).
[5] Operating Agreement ¶ 10(c).
[6] Operating Agreement ¶ 6.

CASE NO.

54.   At the time Michael Enriquez and Mizuno approached DTF for funding Model Obsession, Michael Enriquez and Mizuno intended to commit fraud in order to convert almost three hundred thousand dollars from DTF under the guise of funding the business operations of Model Obsession.

55.   On or about July 2007, Mr. Caisse requested, from Michael Enriquez and Mizuno, an accounting of the expenditures by Michael Enriquez and Mizuno for Model Obsession, given that the investment demanded of DTF far exceeded the amount contemplated by the first year's budget and the Operating Agreement.  Mr. Caisse received a mess of receipts, checks, and handwritten "invoices" for renovations made to a house being leased in Malibu by Michael Enriquez, which apparently was leased at $60,000 per month.  At the time, Mr. Caisse was concerned about the quick depletion of Model Obsession's capital resources but did not investigate further because there appeared to be documentation for all the expenditures.

56.   However, sometime later, Mr. Caisse revisited the subject and began looking more critically at the receipts, checks, withdrawals and invoices.  Upon closer investigation Mr. Caisse learned that with few exceptions, none of the expenditures had been approved pursuant to the Operating Agreement.  Furthermore, the majority of the receipts had been altered to reflect different prices and/or dates for the expenditures.[7]  Finally, multiple funds transfers and cash withdrawals had occurred without any explanation.  Examples of the ways in which Michael Enriquez and Mizuno fraudulently converted investments from DTF include:

     a.   Undocumented cash withdrawals and transfers to unknown and undisclosed Wells Fargo accounts between June 4, 2007 and July 9, 2007 in the amount of 215,900.00;

     b.   Unauthorized and falsified receipts and invoices for labor and materials to remodel the Malibu home in the amount of $22,324.55, including handwritten lists of expenditures and labor,

CASE NO.

a mess of unorganized receipts, and a Value web invoice dated May 5, 2007 for $6,000.00 which, upon further investigation, was actually billed on May 2, 2002 for $197.50;

c.   Falsified receipts for the unauthorized purchase of Dell computer equipment and photographic equipment in the amount of $51,353.00; and,

d.   Unjustified non-Model Obsession expenditures in the amount of $7,200.00.

57.   Pursuant to the methods described above, Michael Enriquez and Mizuno were able to convert almost $300,000 from DTF.  DTF and Michael Enriquez and Mizuno are in engaged in formal arbitration proceedings for the conduct described above.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Fraud As Against Defendant Michael Enriquez and DOES 1-10)

58.   Plaintiff realleges and incorporates by reference, as though fully set forth herein, each and every allegation in paragraphs 1 through 57 above.

59.   As set forth hereinabove, Michael Enriquez, between December 2009 and January 2011, made oral and written misrepresentations of material facts as to his business operations, including but not limited to Jet Set Dating, Model Obsessions and the Mediterranean Event Business and the viability of the same to Dr. Rose, all with knowledge of their falsity, all with the intent to induce Dr. Rose to wire large amounts of money to him, and for his own personal benefit and for the personal benefit of the other Defendants, rather than to fund legitimate business operations including the purported Jet Set Dating, Model Obsession, and the Mediterranean Event businesses.

60.   In truth and in fact, each of the representations made to Dr. Rose by Michael Enriquez were false and fraudulent and were made for the purposes of defrauding Dr. Rose out of over $3.5 million, which was used by Michael Enriquez to

support his lavish and extravagant life style and to support the lifestyle of Defendant Jesus Enriquez, and Canizales and Yawn, for over approximately two-years, without any intent to repay him, without any effort to repay him, all based upon the false and fraudulent representations that that Dr. Rose's money was being used to provide capital and liquidity for the various businesses   Michael Enriquez purportedly operated and which Dr. Rose believed he had invested in.

61.   Michael Enriquez intended to induce Dr. Rose's reliance on his representations in that Michael Enriquez made the oral and written representations and misrepresentations or omissions of material facts all as set forth in paragraphs 14 through 47 above, all of which led Dr. Rose to believe that Michael Enriquez was running legitimate businesses, was very well connected, and that he could expect both the return of his money and profits from the businesses, and other benefits including various learning opportunities.

62.   Dr. Rose's reliance on the oral and written misrepresentations of material facts by Michael Enriquez was reasonable and justifiable in that Michael Enriquez took elaborate steps to ensure he would be believed, including having Clymer make representations to Dr. Rose of Michael Enriquez's "bona fides"; by having Mizuno travel to Michigan to take professional photographs of Dr. Rose's fiancé, and subsequently Dr. Rose himself; by having numerous dinner meetings with Dr. Rose advising him of the progress of the businesses and the success of the same; by presenting Dr. Rose with bank statements with purported account balances in the millions of dollars; in having MJ Moore issue letters, representing that it was a fund transfer agent; and by having a recorded telephone message left on Dr. Rose's telephone from individuals who represented themselves to be high ranking White House officials, which calls which appear to have been placed from the White House to Dr. Rose.  In addition Michael Enriquez presented Dr. Rose with business plans and business records, including tax-returns and bank statements showing significant income, earnings and resources; all of which were false and fraudulent and were

presented to Dr. Rose with the intent to induce Dr. Rose to provide Michael Enriquez funding for his purported businesses, and access to Dr. Rose's credit facilities, all of which were reasonably and justifiably relied upon by Dr. Rose in setting up the credit facility, allowing access to the same, and in transferring money to the Defendants, either by check or wire transfer, all of which was not used for the purpose for which the money was intended, all as heretofore set forth.

63.     As a direct and proximate cause of Michael Enriquez's actions as heretofore set forth, Dr. Rose has been damaged in an amount of $3,606,267.54.

64.     Michael Enriquez' acts were undertaken with intent to defraud, were willful, wanton, malicious and oppressive, and based thereon Dr. Rose is entitled to an award of exemplary and punitive damages in a sum appropriate to punish Michael Enriquez and deter future similar misconduct.

## SECOND CLAIM FOR RELIEF

### (Fraud as Against Defendant Jesus Enriquez and DOES 1-10)

65.     Plaintiff realleges and incorporates by reference, as though fully set forth herein, each and every allegation in paragraphs 1 through 57, above.

66.     Between January, 2010, and January, 2011, Jesus Enriquez, gained access to Dr. Rose's American Express Credit Card through his brother, purportedly to be used to pay for legitimate and appropriate business expenses he would incur for his work with Michael Enriquez various business enterprises in which Dr. Rose believed he was an investor, including Jet Set Dating, Model Obsession, and the Mediterranean Event Business; and as a loan to help his ailing mother (Andrea Mata) whom he claimed had severe health problems.  Additionally, and among others, Jesus Enriquez made representations to Dr. Rose that Michael Enriquez was a successful and legitimate businessman, that he was to be believed when he informed Dr. Rose that he would receive training with the U.S. Marshal Service, Air Force Flight Surgeon training, a prestigious board position, in addition to his promises to make good on his loans and investments.  Based upon the facts set forth above, Dr. Rose

justifiably and reasonably relied upon the representation made to him by Jesus Enriquez, which representations were false when made and were made to induce Dr. Rose to allow Jesus Enriquez access to his credit facility as hereinafter alleged.

67.   Between January, 2010 and January 2011, Jesus Enriquez incurred charges against Dr. Rose's American Express Credit Card of $170,621.84 for non-authorized business expenses and personal charges, without any intent to repay him, all based upon his false representations that the funds (charges against the American Express Account) were for legitimate and authorized expenses.  As a direct and proximate cause of Jesus Enriquez's actions, Dr. Rose has been damaged in an amount according to proof, but in excess of $170,621.84.

68.   Jesus Enriquez' acts as hereinabove alleged were undertaken with intent to defraud, were willful, wanton, malicious and oppressive, and based thereon, Dr. Rose is entitled to an award of exemplary and punitive damages in a sum appropriate to punish Jesus Enriquez and deter future similar misconduct.

## THIRD CLAIM FOR RELIEF

### (Conspiracy to Commit Fraud Against All Defendants, Except Kim Mizuno and DOES 1-10)

69.   Plaintiff realleges and incorporates by reference, as though fully set forth herein, each and every allegation in paragraphs 1 through 68 above.

70.   In engaging in the acts and conduct hereinabove described, and particularly in regarding to defrauding Dr. Rose of over $ 3.5 million of his money, the Defendants, and each of them, excluding Kim Mizuno, but including Defendants named herein as Does 1 through 10, (the "Defendants") entered into common plan with the intent to profit from the schemes and artifices more particularly set forth above, at the expense of Dr. Rose and agreed to participate in the fraud of Dr. Rose, all as more specifically set forth above.

///

71.    The Defendants are each entities or persons capable of holding legal or beneficial Interest in property and, as such, each of these Defendants did, jointly and severally, unlawfully, willfully, knowingly and intentionally devised schemes and artifices to defraud Dr. Rose and did unlawfully, willfully, knowingly and intentionally conspire together and with each other to execute the fraudulent schemes hereinabove set forth.

72.    The enterprises conducted by the Defendants and their instrumentalities involved the use of investor money, all as specifically describe above, and knowingly, intentionally and willfully solicited investors in the states of California, Nevada, and New York, and then taking the money from the purported investment for their own personal gain and profit.

73.    The Defendants, as a result of the fraudulent schemes and practices described herein, have received income derived directly or indirectly from the fraudulent conduct and have used or invested directly or indirectly parts of said income, or the proceeds of such income, to further their fraud and to support their lifestyles.

74.    Defendants have, through a pattern of fraudulent conduct, acquired or maintained directly or indirectly an interest or control of the Dr. Rose's funds.

75.    Each Defendant was associated with the fraudulent acts identified herein, and knowingly conducted or participated in the aforesaid fraud.  As a direct and proximate cause thereof, Dr. Rose has been injured financially as a result of Defendants' fraud, and, by reason of the foregoing, Defendants are liable to Plaintiff, in an amount $3,606,267.54.

76.    The aforementioned acts of Defendants, and each of them, were done willfully, maliciously, oppressively and with intent to defraud, and Plaintiff is entitled to punitive and exemplary damages in an amount to be shown according to proof.

///

## FOURTH CLAIM FOR RELIF

## (Violations of The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (2000 ed. and Supp. III as Against All Defendants).

77.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, each and every allegation in paragraphs 1 through 76 above.

78.    In doing the acts hereinabove alleged and as specifically presented in paragraphs 8 through 75, the Defendants conduct constitutes violations of 18 U.S.C. §1962(a) and (b) and as a result thereof Dr. Rose was injured in his business and property thereby.

79.    The Defendants entered into a fraudulent business enterprise, using as instrumentalities of their enterprise Jet Set Dating, Model Obsession, and the Mediterranean Event Business, with the intent to profit from the schemes and artifices more particularly set forth above and as set forth in 18 U.S.C. §1961. This common law business operation was an "enterprise" within the meaning of 18 U.S.C. §1961(4).

80.    The Defendants are each entities or persons capable of holding legal or beneficial interest in property and therefore are "persons" within the meaning of 18 U.S.C §1961(3) and, as such, each of these Defendants did, jointly and severally, unlawfully, willfully, knowingly and intentionally devise schemes and artifices to defraud the Dr. Rose and did unlawfully, willfully, knowingly and intentionally conspire together and with each other to execute the fraudulent schemes.

81.    The enterprises conducted by the Defendants and their instrumentalities each affected interstate commerce within the meaning of 18 U.S. C. §1962(a) (b), (c) and (d), in that the fraud involved the sale of investments and the use of investor money, which money and documents were transmitted through U.S. mail, wire transfers and other vehicles of interstate commerce.

82.    The Defendants have committed violations of 18 U.S.C. §1961 *et. seq.* through the predicate acts of mail fraud in violation of 18 U.S.C. §1341 by knowingly, intentionally and willfully using the mails to perpetrate their fraud by soliciting

CASE NO.

1  investors in the states of California, Nevada, Texas, and New York, and then taking
2  the money for their own personal gain and profit.

3      83.    The Defendants have committed violations of 18 U.S.C. §1961 *et. seq.*
4  through the predicate acts of counterfeiting in violation of 18 U.S.C. §§ 471, 472, and
5  473, by knowingly, intentionally and willfully using fabricated documents to
6  perpetrate their fraud by soliciting investors and then showing false returns on such
7  investments, and account statements, all as set forth above, in the states of California,
8  Nevada, Texas, and New York, and then taking the money for their own personal gain
9  and profit.

10      84.    The Defendants have committed violations of 18 U.S.C. §1961 *et. seq.*
11  through the predicate acts of engaging in extortionate credit transactions in violation
12  of 18 U.S.C. §§ 891-894, by knowingly, intentionally and willfully accessing Dr.
13  Rose's credit facilities, under threat of harm, in, among others, the states of California,
14  Nevada, Texas, New York, Hawaii, and Florida, and, among others, and in the
15  countries of France, Italy, and Switzerland, for their own personal gain and profit.

16      85.    The Defendants have committed violations of 18 U.S.C. §1961 *et. seq.*
17  through the predicate acts of fraud and related activity in connection with
18  identification documents in violation of 18 U.S.C. § 1028, by knowingly, intentionally
19  and willfully using fabricated identification documents, including false and fraudulent
20  tax returns, bank account statements, and business plans, and by failing to disclose
21  prior frauds and prior criminal activities, to perpetrate their fraud in soliciting
22  investments from Dr. Rose and others, and by and attempting to hide their identities,
23  in the states of California, Nevada, Texas, and New York, and then taking money
24  from Dr. Rose for their own personal gain and profit.

25      86.    The Defendants have committed violations of 18 U.S.C. §1961 *et. seq.*
26  through the predicate acts of wire fraud in violation of 18 U.S.C. §§ 1343, by
27  knowingly, intentionally and willfully wiring funds from Dr. Rose's banking account
28  without his knowing consent or permission for the purpose actually intended, wiring

funds from Dr. Rose's credit accounts to their associates, including Clymer and Canizales, and themselves, to perpetrate their fraud, in, among others, the states of California, Nevada, Texas, New York, Florida, Michigan, and, among others, the countries of France, the United Kingdom, and Switzerland, for their own personal gain and profit.

87.   The Defendants, through their acts and conduct hereinabove alleged, committed violations of 18 U.S.C. §1961 *et. seq.* through the predicate acts of financial institution fraud in violation of 18 U.S.C. § 1344, by knowingly, intentionally and willfully using fabricated bank documents to perpetrate their fraud, and by hacking into Dr. Rose's banking account and wiring funds out of such account, in, among others, the states of California, Nevada, Texas, New York, Florida, Michigan, and, among others, the countries of France, the United Kingdom, and Switzerland, for their own personal gain and profit.

88.   The Defendants through their acts and conduct hereinabove alleged, committed violations of 18 U.S.C. §1961 *et. seq.* through the predicate acts of interference with commerce, robbery, or extortion, in violation of 18 U.S.C. § 1951, by knowingly, intentionally and willfully using threats of violence to induce Dr. Rose's cooperation, including telling Dr. Rose of prior beatings sustained by those that crossed them, and by implied threats of violence, and to force Dr. Rose to continue providing funds to the Defendants, in the states of California, Nevada, and Texas, for their own personal gain and profit.

89.   The Defendants, through their acts and conduct hereinabove alleged, committed violations of 18 U.S.C. §1961 *et. seq.* through the predicate acts of racketeering in violation of 18 U.S.C. § 1952, by knowingly, intentionally and willfully using fabricated bank documents to perpetrate their fraud, by using threats of violence to extort funds, by hacking into Dr. Rose's banking account, in, among others, the states of California, Nevada, Texas, New York, Florida, Michigan, and, among others, the countries of France, the United Kingdom, and Switzerland, for their

CASE NO.

own personal gain and profit.

90.     The Defendants, through their acts and conduct hereinabove alleged, have committed violations of 18 U.S.C. §1961 *et. seq*. through the predicate acts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, by knowingly, intentionally and willfully using fabricated bank documents to perpetrate their fraud, and by hacking into Dr. Rose's banking account and wiring funds out of such account, in, among others, the states of California, Nevada, Texas, New York, Florida, Michigan, and, among others, the countries of France, the United Kingdom, and Switzerland, for their own personal gain and profit.

91.     The Defendants, through their acts and conduct hereinabove alleged, committed violations of 18 U.S.C. §1961 *et. seq*. through the predicate acts of illegally transmitting money in violation of 18 U.S.C. § 1960, by knowingly, intentionally and willfully using fabricated bank documents to perpetrate their fraud, and by hacking into Dr. Rose's banking account and wiring funds out of such account, in, among others, the states of California, Nevada, Texas, New York, Florida, Michigan, and, among others, the countries of France, the United Kingdom, and Switzerland, for their own personal gain and profit.

92.     Defendants, as a result of the fraudulent schemes and practices described herein, received income derived directly or indirectly from a pattern of racketeering activity and used or invested directly or indirectly parts of such income, or the proceeds of such income, in the speculation of an interest in, or the establishment or operations of, the aforesaid enterprise which is engaged in, or the activities of which affect, interstate commerce within the meaning of 18 U.S.C§ 1962(a).

93.     Defendants have, through a pattern of racketeering activities, acquired or maintained directly or indirectly an interest or control of the aforesaid enterprises which are engaged in, or the activities of which affect, interstate commerce within the meaning of 18 U.S.C. §1962(b).

CASE NO.

94.     Each Defendant was employed by or associated with the enterprise identified herein, and knowingly conducted or participated in the aforesaid enterprise, through a pattern of racketeering activities within the meaning of 18 U.S.C. §1962(c) all as heretofore specifically set forth.  As a direct and proximate Dr. Rose has been injured financially as a result of Defendants violations of 18 U.S.C. § 1962 and, by reason of the foregoing, Defendants are liable to Dr. Rose, pursuant to 18 U.S.C. §1964(c), in an amount of $3,606,267.54.

95.     Pursuant to the provisions of 18 U.S.C. §1964(c) Plaintiff is entitled to treble damages, costs of suit, including reasonable attorney fees, all in an amount to be shown according to proof.

### FIFTH CLAIM FOR RELIEF

**(Aiding and Abetting Fraud as Against Defendant**

**Kim Mizuno and DOES 1-10)**

96.     Plaintiff realleges and incorporates by reference, as though fully set forth herein, each and every allegation in paragraphs 1 through 95 above.

97.     As set forth above, Defendant Kim Mizuno is a well-known nude-model photographer.  Mizuno was a principal of Models Obsession, LLC, and met with the Brian Caisse on numerous occasions in order to induce Caisse to have his investors provide capital for Models Obsession, LLC.  He was or is also an officer of MPD.  Further Mizuno often met with Michael Enriquez and conducted photography sessions at the Malibu home Enriquez rented.  Further Mizuno was advised by Caisse that Michael Enriquez was committing a fraud in the manner in which he was spending the capital of Model Obsession, all as set forth above.  As a result of this information, and his participation in Model Obsession, and as a corporate officer of MPD, Mizuno had actual knowledge of Michael Enriquez fraud and of the fraud Enriquez was perpetrating using Model Obsession business as a ruse to obtain money for his own personal gain.

CASE NO.

98.    Also as set forth above, in traveling to Detroit, Michigan under the false representation that he was there for a Playboy Model shoot, and in meeting with Dr. Rose and his fiancé, and in taking pictures of his fiancé and subsequently Dr. Rose, Mizuno aided and abetted Michael Enriquez's fraud, by lending legitimacy to Michael Enriquez representations of his business, even though Mizuno knew those representations were false.  Dr. Rose is further informed and believes that the pictures taken of him by Mizuno were used by Michael Enriquez as part of his theft of Dr. Rose's identity which, Dr. Rose is informed and believes allowed Michael Enriquez to gain access to Dr. Rose's accounts as heretofore set forth.

99.    As a direct and proximate result of Mizuno's aided and abetting Michael Enriquez fraud of Dr. Rose, Dr. Rose has been damaged in the amount of $3,606,267.54.

### SIXTH CLAIM FOR RELIF

### (Breach of Fiduciary Duty as Against All Defendants, and DOES 1-10)

100.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, each and every allegation in paragraphs 1 through 99 above.

101.    As a result of the business relationship as between Dr. Rose and Defendants Michael Enriquez, Jesus Enriquez, and Kim Mizuno, individually and as officers of the Defendant corporations and companies, there existed a fiduciary relationship and obligation of the Defendants to Dr. Rose, to act on his behalf and in his best interests.

102.    Defendants, and each of them, breached their fiduciary obligations owed to Dr. Rose by perpetrating the fraud upon him as set forth above, and by using the capital Dr. Rose provided for Michael Enriquez's various business enterprises, including the Defendant corporations and companies, contrary to the express purpose of the parties and for the Defendants' own personal gain and benefit.

103.    As a direct and proximate result of the Defendants conduct, Defendants and each of them breached their fiduciary duties and obligations owed to Dr. Rose,

CASE NO.

1   and damages Dr. Rose in an amount in excess of $3.5 million.

2   104.   Defendants acts as hereinabove alleged were undertaken with intent to

3   defraud, were willful, wanton, malicious and oppressive, and based thereon, Dr. Rose

4   is entitled to an award of exemplary and punitive damages in a sum appropriate to

5   punish Defendants and deter future similar misconduct.

6                        **SEVENTH CLAIM FOR RELIF**

7                  **(Conversion as against All Defendants)**

8   105.   Plaintiff realleges and incorporates by reference, as though fully set forth

9   herein, each and every allegation in paragraphs 1 through 104 above.

10   106.   Despite Dr. Rose's requests to return his funds, Defendants have failed to

11   do so.  Instead, Defendants have used Dr. Rose's funds for their own purposes without

12   Dr. Rose's permission or consent.  By doing so, Defendants have willfully deprived

13   Dr. Rose of the use and possession of his monies without lawful justification.

14   107.   As a result of Defendants' conversion, Dr. Rose has been damaged in an

15   amount according to proof at trial, but no less than $3,606,267.54.

16   108.   The acts of Defendants were willful, wanton, and oppressive and were

17   undertaken with an intent to defraud Dr. Rose.  Accordingly, Dr. Rose is entitled to

18   recover exemplary and punitive damages in an amount deemed sufficient by the trier

19   of fact to punish and make an example of Defendants, and to deter such conduct in the

20   future.

21                        **NINTH CLAIM FOR RELIEF**

22              **(Money Had and Received as Against All Defendants)**

23   109.   Plaintiff realleges and incorporates by reference, as though fully set forth

24   herein, each and every allegation in paragraphs 1 through 108 above.

25   109.   Beginning in or about February, 2009, and continuing through February,

26   2011, Defendants, and each of them, became indebted to Dr. Rose in the amount of

27   $3,606,267.54, for money had and received by Defendants, and each of them, for the

28   use and benefit of Dr. Rose.

CASE NO.

110.  No payment has been made by Defendants, or any of them, toward repaying the $3,606,267.54.

111.  Dr. Rose has demanded repayment, but Defendants, and each of them, have failed and refused to pay the amount demanded.

112.  There is now due and owing from Defendants, and each of them, to Dr. Rose the principal amount of $3,606,267.54, together with costs and interest

**WHEREFORE,** Dr. Rose prays for judgment as follows:

**On the First Claim for Relief for Fraud:**

1.   For compensatory damages according to proof at trial;

2.   For general damages according to proof at trial;

3.   For exemplary and punitive damages, in an amount to be proved at trial;

**On the Second Claim for Relief for Fraud:**

4.   For compensatory damages according to proof at trial;

5.   For general damages according to proof at trial;

6.   For exemplary and punitive damages, in an amount to be proved at trial;

**On the Third Claim for Relief for Conspiracy to Commit Fraud:**

7.   For compensatory damages according to proof at trial;

8.   For general damages according to proof at trial;

9    For exemplary and punitive damages, in an amount to be proved at trial;

**On the Fourth Claim for Relief for RICO:**

10.   For damages according to proof which the damages be trebled according to statute.

**On the Fifth Claim for Relief for Aiding and Abetting Fraud:**

11.   For compensatory damages according to proof at trial;

12.·   For general damages according to proof at trial;

On the Sixth Claim for Relief for Breach of Fiduciary Duty:

13.   For compensatory damages according to proof at trial;

14.   For general damages according to proof at trial.

15.   For exemplary and punitive damages, in an amount to be proved at trial;

**On the Seventh Claim for Relief for Conversion:**

16.   For compensatory damages according to proof at trial;

17.   For general damages according to proof at trial;

18.   For exemplary and punitive damages, in an amount to be proved at trial;

**On the Eighth Claim for Relief for Money Had and Received:**

19.   For compensatory damages according to proof at trial;

20.   For general damages according to proof trail;

**On All Causes of Action:**

22.   For costs of suit herein;

23.   For reasonable attorneys' fees;

24.   For interest according to proof; and

25.   For such other and further relief as the Court deems just and appropriate under the circumstances.

Dated:  September 22, 2011                      EZRA BRUTZKUS GUBNER LLP


By: _____
      NICHOLAS A. ROZANSKY
Attorneys for Plaintiff, Jonathan D. Rose,
M.D., Ph.D.

CASE NO.

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury.

Respectfully submitted,

Dated:  September 22, 2011            EZRA BRUTZKUS GUBNER LLP


By: _____
          NICHOLAS A. ROZANSKY
Attorneys for Plaintiff, Jonathan D. Rose,
M.D., Ph.D.

CASE NO.

# EXHIBIT 1

# MODEL OBESSSION, Inc.

# BUSINESS PLAN

Contact:
Mike Enriquez & Kim Mizuno
Email Address: Michael Enriquez: ModelObsession@aol.com
Kim Mizuno: mizuno@playboy.com

*The information contained in this business plan is confidential and proprietary to Model Obsession, Inc. (the company) and is intended only for the persons to whom it is transmitted by the Company or its representatives. Any re production of this document, in whole or in part, or the divulgence of any of its contents without the prior written consent of the Company, is prohibited.*

*This is a business plan. It does not imply and shall not be construed as an offering of securities. Prospective investors are not to construe the contents of this document as investment, legal or tax advice from either the Company or the preparers of this document. Any prospective investor should consult with professional investment advisors and gain professional legal and tax advice.*

*Each potential investor specifically understands and agrees that any estimates, projections, revenue, models, forecasts or assumptions are by definition uncertain and thus possibly unreliable. Any party considering a transaction with the Company agrees to look solely to its own due diligence.*

**Business Plan Copy No._____**

# Confidentiality Agreement

The undersigned read acknowledges that the information provided by Model Obsession, Inc. in this business plan is confidential. Therefore, the undersigned reader agrees not to disclose any of such information without the express written permission of Model Obsession, Inc.

It is hereby acknowledged by the undersigned that the information to be furnished in this business plan is in all respects confidential in nature (other than such information which is already in the public domain through other means) and that any disclosure or use of same by the undersigned may cause serious harm or damage to Model Obsession, Inc.

Upon request, this document is to be immediately returned to Model Obsession, Inc.

_____
Signature

_____
Print Name

_____
Date

2

41

# TABLE OF CONTENTS

EXECUTIVE SUMMARY                          4-5
MANAGEMENT & ORGANIZATION                   6
MODEL OBSESSION INC. PROJECT                 7
THE INDUSTRY AND MARKET                      8
REVENUE SOURCES                            9-10
MIZUNO MODEL SITE                           11
INVESTMENT FUNDS NEEDED                      12
APPENDIX                                  13-17

3

# MODEL OBSESSION, Inc.
# BUSINESS PLAN

## EXECUTIVE SUMMARY

### Company Background

Model Obsession, Inc., hereto after known occasionally as MO, is a new innovative Internet model website, formed as a corporation under the corporate laws of Nevada.

The Company's principals are experienced, forward thinking individuals who have a strong grasp on the business of which they are engaging. By putting together their business successes and extensive relationships, they will prove to be an unstoppable force in the Internet universe. MO will be multi faceted by allowing subscribers to view model portfolios and clients to contact models for employment. As the Internet has no geographical boundaries, MO will be available to subscribers and clients throughout the world.

### THE COMPANY
#### History & Founders

Model Obsession, Inc is the brainchild of Michael Enriquez and Kim Mizuno. They have identified a niche in the Internet model portfolio websites, which will be filled by Model Obsession, Inc. MO will become known as the premiere model portfolio website to it's viewers and clients. This will be due to the managerial skills and creative talent of it two founders. Their mutual understanding and experience in the world of modeling and entertainment combined with their creative vision and relationships promises to put this venture on the fast track to success and high dollar profits.

Michael Enriquez is a successful entrepreneur who has deep relationships in the creative and world business community. He is well suited to manage this company, being a graduate in 1994 from UCLA majoring in Finance. As a Los Angeles based talent consultant with over 15 years experience, he has worked in the worldwide market with high profile talent and managed special event projects that required a high degree of creativity and excellent judgment. His ability to work with a budget and to incorporate his excellent interpersonal communication skills has proven to be his hallmark trade. Michael works on a daily basis with models from Playboy, Penthouse, Elite and Ford model management, Victoria's Secret and most recently some of the biggest names in the fitness industry. These networking skills and relationships are just the starting point for Model Obsession, Inc.'s client list.

4

Kim Mizuno, known as "Mizuno" in the world of Playboy is one of the most published and well-respected photographers in the history of Playboy and has over 20 years experience photographing some of the most beautiful women in the world. Mizuno conducts numerous Playboy casting calls across the United States and is one of the key photographers for Playboy's highly anticipated college issues, Girl Next Door videos, Playboy's International/Special Editions and his celebrity clientele are the who's who of Hollywood. Mizuno is also the creator of the widely successful East/West Asian model calendar series and has several books published in Asia. Mizuno's style and creative eye have made him one of the most sought after photographers in the business.  His reputation and relationships will go a long way in bringing clients to Model Obsession, Inc.

## MANAGEMENT AND ORGANIZATION

Model Obsession, Inc will be managed by the partnership of Mike Enriquez and Kim Mizuno. These two men are the primary strength in the management team. Both will oversee the daily activities and handle all financial matters. As growth requires they will hire experienced personnel. Initially the company is being structured to be as lean as possible thus maximizing profits from revenues.

Dan Faiman will do website management and development.
See appendix for full details.

Dan Faiman has 11 years experience in Computer / Web Design. Forming Online-Redefined at the age of 16 as a computer consulting company which programs, networks, and customizes computers for small to mid size companies, as well as a full web development team and search engine optimization specialists. Online-Redefined is a 360 computer company with clients ranging from Microsoft, FedEx, and Martha Stewart, to Pixar, Fremantle Media (American Idol) and most recently Jaguar, Ashton Martin, and BMW.

On top of helping clients' research, develop, and launch their web dreams, Dan Faiman has helmed a few web 3.0 companies himself. Working on a few upcoming mobile platforms, to entertainment industry database networks, and photo recognition software. This large array of a portfolio has recently led Dan and Online-Redefined the ability to work with most of the large tech firms in San Diego such as Gunderson Dettmer and Wilson Sonsini. These VC firms have clients such as Youtube, Google, Paypal, and Veoh to name a few. These San Diego law firms have not only passed on equity in return for Dan's guidance and a CTO title but have referred him to several partnerships with their client roster. He's currently working on 2 development platforms for fully funded web companies.

# MODEL OBSESSION INC. PROJECT

MODEL OBSESSION is a unique investment opportunity. It is a multi faceted website that is designed to maximize viewer and client satisfaction worldwide. Beautiful Models will post their portfolios to showcase their talent on the website. Individuals will subscribe and have access to the models portfolios. In addition casting directors, party planners, convention planners, agents and managers will subscribe to the service and offer employment opportunities to models.

Models Obsession offers a unique opportunity to the models who subscribe to the website. They will have a choice to shoot with Kim Mizuno, who will have the option of getting their pictures submitted directly to Playboy Magazine. This unique opportunity will be a leading competitive edge for Model Obsession over the other Internet sites.

Model Obsession will be the leading brand for the online modeling community by utilizing the tools of subscribing to search engines, advertising, producing events and attracting the most beautiful and talented people online. Model Obsession's awareness of the website will grow exponentially as will revenues.

Model Obsession will look to be involved with only the best and most aggressive partners, sponsors and vendors. It will strive and achieve to become the number one source for aspiring as well as established models and photographers to showcase their talent in a safe and convenient environment.

## THE INDUSTRY

The modeling portfolio website is a billion dollar business with numerous websites. None of which offers the unique opportunities and management expertise found at Models Obsession.  The industry's leading competitor is One Model Place which currently has over 300,000 members with over 200,000 members paying a monthly fee of at least $13.99 thus producing a revenue stream of $2.8 million dollars a month.  Model Obsessions can achieve these numbers and more.

## THE MARKET

The market for subscriber potential is unlimited, as borders do not bind the Internet. It is a worldwide market place with billions of potential subscribers.

## REVENUE SOURCES

Revenue for Model Obsession will come from three distinct categories of subscribers each of which have its own unique pricing structure and will contribute to a very profitable bottom line.

Category 1 $9.99 a month

Fan/Viewer membership. This membership will allow access to the content on the website, without any hosting features.

Category 2 consists of three options and pricing structures and is designed for models who want to feature their portfolio on our website.

Option 1: $14.99 a month Basic Program

This basic subscription program will allow the client to have unlimited viewing and acknowledgments. The client will be able to post 20 pictures, 1 video and receive 4-5 notifications a month from casting directors. It is management's belief that once clients experience this basic option that in a short time they will upgrade to one of the following two other plans.

Option 2: $24.99 a month Gold Plan

This plan will allow for 21-40 pictures, unlimited notifications from casting directors, and photographers, capabilities to categorize their photos and a private email account and allow for 2MPEG's to be posted to their site.

Option 3: $34.99 Platinum

This Plan is the highest level available to clients and offers the most versatility. It features extensive portfolio management, which includes
Notification for all potential jobs, unlimited uploading of pictures, ability to categorize upload pictures into different classifications, special personalized email account, and uploading of MPEG files.

Category 3 is designed for outside potential employers such as casting directors, agents, and modeling agencies. This category will have two pricing structures.

Option 1 $19.99 a month

This option will allow subscribers to contact clients with notifications of up to 30 notifications a month.

Option 2 $29.99 a month
This option will allow subscribers unlimited notifications to models and post unlimited job opportunities for clients.

Clients will be able to view beautiful models from around the world as well those professionals looking to employ Model Obsession's clients.

Initial clients will be built around the growing network of Playboy photographer Mizuno and business entrepreneur Mike Enriquez.  The multiple platform choices for customers ensure the potential for maximum subscription numbers and hence tremendous revenue.

## MIZUNO MODEL SITE

KIM MIZUNO'S model site is an important additional revenue stream to the Model Obsessions, Inc overall business model. This part of the site will feature exclusive photography of Playboy photographer Kim Mizuno. The site will have nude and non-nude sections. The nude section will be a portal into US Playboy and to all of Playboy's 24 International Editions which will make this part of the website thrive globally in print as well as online. The non-nude section will be a portal into magazines such as Maxim and similar non-nude publications.

Models from around the world will be covered. They will come from the US, Canada, Mexico, Japan, Korea, Vietnam, China, Thailand, India, France, Spain, Czech Republic, Germany, Brazil, Venezuela, Australia, Hungary, Poland, Great Britain, Denmark, Norway and many more. In addition, Mizuno will screen guest photographers to upload their photography as an additional feature for subscribers.

As this part of the website will have a substantial capital expenditure it will be an immediate source of revenue and profit which will contribute significantly to the bottom line and most importantly, create the attraction for Model Obsession.

Membership fees will be based on a monthly subscription fee of $19.95.
It is anticipated that within 18 months subscriptions could be in excess of 100,000 paying members who translates into gross revenue of $1,995,000.00 a month. Initially there will be promotions to attract viewers and with word of mouth the site will accelerate in its subscription base very quickly.

## INVESTMENT FUNDS NEEDED

Model Obsessions, Inc is seeking 1 million US dollars as start up capital.  It is anticipated by management that these funds will allow the start up company to fund initial start up costs including website development, launching, salaries and necessary business expenses.  It is anticipated that a positive cash flow shall occur within 18 months of launching.

EXCEL CASH FLOW PROJECTIONS FOR INFLOW AND OUT FLOW

The 1 million dollar investment will represent a 30% ownership stake in the company.

CASH FLOW REQUIREMENTS FUNDED BY THE INITIAL INVESTMENT

|  | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 |  |
|---|---|---|---|---|---|---|---|
| Location Costs | 29750 | 29750 | 29750 | 29750 | 29750 | 29750 | 178500 |
| Shoot Costs | 34695 | 34695 | 34695 | 34695 | 34695 | 34695 | 208170 |
| Website | 35000 | 35000 | 35000 | 35000 | 35000 | 35000 | 210000 |
| Equipment | 95330 |  |  |  |  |  | 95330 |
|  |  |  |  |  |  |  |  |
| Web/Logo Design | 25,500 |  |  |  |  |  | 25,500 |
| Misc costs | 14083 | 14083 | 14083 | 14083 | 14084 | 14084 | 84500 |
|  |  |  |  |  |  |  |  |
| Salaries |  |  |  |  |  |  |  |
|  | 33000 | 33000 | 33000 | 33000 | 33000 | 33000 | 198000 |
|  |  |  |  |  |  |  |  |
| TOTAL CASH NEEDED | 267358 | 146528 | 146528 | 146528 | 146529 | 146529 | 1000000 |
| NOTES: |  |  |  |  |  |  |  |
| Shoot costs for crew, props, photographers |  |  |  |  |  |  |  |
| Data Entry Info: data associates... As point grows staff will be added |  |  |  |  |  |  |  |
| Equipment: This is a one time costs for cameras, video cams, computer and editing equipment |  |  |  |  |  |  |  |
| Misc Costs include models fees, celebrity shoots, editing, etc. |  |  |  |  |  |  |  |

## APPENDIX – Dan Faiman Proposal



**online** redefined

Mike Enriquez, Kim Mizuno                                                      6/26/2008
C/O ModelObsession.com

Mike Enriquez and Kim Mizuno have requested a proposal for the design, programming, and production of the site ModelObsession.com. Production phase will begin immediately after approval and will take roughly an estimated 90 days after design phase, through programming to completion.

| Design Phase | $23,500 - $25,500 |
|---|---|

The design phase will encompass all aspects of the artwork, graphics, and content. We'll start with branding and trademark in respects to the logo, homepage, and inner designs. After logo approval we'll start the business card development phase while integrating the homepage layout and sub categories.

The page designs are as follows (3 weeks with timely client feedback ) :

- Homepage
- Search Functionality
- Super User
- Regular User
- Inner Pages – for news, video, updates, and external content

Logo Design Phase ( 1 month – overlaps with page design ) :

- Logo Design and Site Branding
- Help with submission for trade marking
- Business card development includes 1,000 cards printed (500 for Kim, 500 for Mike)

Extra costs included in submitted price are as follows:

- Meetings for client overviews
- Travel time and expenses
- Phone calls and art direction with client and team
    o Pre-Marketing Strategy meeting

13

| Layout Phase | $15,000 - $17,500 |
|---|---|

The layout phase will take us into final stages of designs and concepts for the site. We begin to cut apart the raw images selected by client and convert them into workable html code. This will take roughly 2 weeks for all pages and artwork to be tabled and pieced into html templates. Upon finalization the html code will be placed on a beta server (online-redefined.com/modelobsession) for client to review as there can be aesthetic changes when converting images to code.

Client will have 1 week for any feedback and desired changes

Extra costs included in submitted price are as follows:

* Meetings for client overviews
* Travel time and expenses ( automobile within Los Angeles ) if flight is required this is charge to client
* Phone calls and art direction with client and team

Phase time estimations: 2 weeks after design phase

| Server Setup | $7,500 - $8,500 |
|---|---|

Server setup will begin during Layout Phase. Phase will overlap to help with time constraints. All phone calls with server house, setup, integration and management is covered in the cost. PHP, MYSQL, E-mail setup and backup redundancy will be brought online. E-mail configuration with all desired mailboxes, DNS, and domain name transfer to host, account creation

During this phase a splash screen with e-mail registration will be available for 2 purposes : 1) To collect potential user data and send newsletters
2) For search engines to collect site data months in advance and start page ranking

Extra costs included in submitted price are as follows:

* Meetings for client overviews
* Travel time and expenses ( automobile within Los Angeles ) if flight is required this is charge to client
* Phone calls with leasing house and team

Phase time estimations: 1.5 weeks during layout phase

| Programming Phase | $25,000 (6 months) |
|---|---|

Programming phase includes all technical aspects of the site. Creation of php code, database, ajax, and other features client desires. During this phase all the code will be created that has been approved for a phase 1 release of the site

Current breakdown:

- Homepage
  - o   Rss Feeds
  - o   Content Management
- User accounts
  - o   Upload Module
  - o   User layout
  - o   Comment system
  - o   Account settings

- Super User Accounts
  - o   Upload Modules
  - o   User Layout
  - o   Search Functionality
  - o   Account settings

- Content Management System
- Administrative account setup verification and approval process
- E-mail activation links
- Blogging Capability

A round one Search Engine Optimization is included in above cost

Extra costs included In submitted price are as follows:

- Meetings for client overviews
- Travel time and expenses ( automobile within Los Angeles ) If flight is required this is charge to client
- Programming team and project coordinator

Phase time estimations :: 60 days after layout phase

| Server to Production Migration | $10,500 |
|---|---|

We will be migrating the data after code completion from our developer server to the live production server for testing. A sub domain access code will be provided during testing so that search engines do not scan the site during testing phases.

Testing of the new server environment, database migration and site mapping to ensure all links and code works properly on the new server.

Server will be checked for the following items:
- Balance and load time
- Capacity
- Overage and potential server handling to ensure server will not have downtime after launch
- Backup maintenance

15

54

During this phase we will begin future components and designs:

- o   Blue print phase 2 document and core programming

**Extra costs included in submitted price are as follows:**

- Meetings for client overviews
- Travel time and expenses ( automobile within Los Angeles ) if flight is required this is charge to client
- Phone calls with server house if needed

**Phase time estimations :: 10 business days**

| Beta Test  (inside corporation) | $9000 –12,500 |
|---|---|

The site will be migrated to a live server and tested with corporate employees. This will check for any broken links, database issues, or confusing user flow and site navigation.

10 Online – Redefined testers will check the site for errors, bugs, etc. As well as Model Obsession desired employees.

**Extra costs included in submitted price are as follows:**

- Meetings for client overviews
- Travel time and expenses ( automobile within Los Angeles ) if flight is required this is charge to client

**Phase time estimations :: 15-20 business days**

| Soft Launch (public Beta) | $4500 |
|---|---|

Model Obsession will be brought online and open for the public, any additional tests will be finalized and checked over. The site will now be fully operational.

Additional fixes will be billed in the cost above due to corrections on a live server. Live servers can be cumbersome to correct due to the volume of traffic it may / may not be receiving

Additional information
- Marketing / Viral / Press Releases to be sent out (cost to client with wire releases and content writer)

**Extra costs included in submitted price are as follows:**

- Meetings for client overviews
- Travel time and expenses ( automobile within Los Angeles ) if flight is required this is charge to client

16

**Hard Launch** $2500

All files are online and the public is now using the site without any restraints. Phase 2 document will be 2.5 months into blueprints and ready for a new beta test within 3 months of hard launch

Graphics and content are brought out of beta phase and removed

**Additional Expenses** Optional

Server Costs - $3500 per month (including server expense, upkeep, and management)
Video Production (varies on shoot, location, and client requests)
Estimation - $10,000
Photo Retouches (based on per project basis, or if client desires to bring on Online-Redefined team freelance)

**Site Estimations**

Time estimations                    90-120 days

Site estimations                    $211,500-$245,000

# EXHIBIT 2

## AGREEMENT FOR SOCIAL NETWORKING PROJECT

THIS AGREEMENT dated Feb. 9, 2009 (the "Effective Date") is made between Michael Enriquez / MPD Mgmt Inc. a Nevada Corporation, whose address is 2505 Anthem Village Dr., Henderson NV 89052 herein after referred to as the "Company" , and Jonathan Douglas Rose , whose address is 13700 Marina Pointe Dr. # 626, Marina Del Rey, Ca. 90292.

WHEREAS, the Company operates an internet based business focused on the Social Networking / modeling industries.

WHEREAS, Jonathan Rose made a personal loan to Michael Enriquez, one of the Company's principal officers, of Forty Five Thousand Dollars ($45,000) (the "Loan Amount") as startup capital for the related business;

WHEREAS, the loan Amount is considered due and owing by Michael Enriquez on or before June 9, 2009

WHEREAS, Jonathan Rose is willing to for go repayment of above mentioned loan to Michael Enriquez under the following considerations:

NOW THEREFORE, in consideration of the mutual covenants and conditions set forth herein the Company and Jonathan Rose agree as follows:

1. Definitions
   a. "Shareholder" is defined as each of the persons who are a signatory hereto.
   b. "Company Interest" is defined as the share of profits and surplus of a Shareholder as specifically apportioned in Paragraph two (2) of this Agreement.

Initials:

ME

57

2. The Shareholder Distribution:

(A)The following is the shareholder ownership interest in the Social Networking Project as of the effective date of this agreement: (1) Jonathan Rose has a Twenty Percent (20%) interest in the company; (2) Michael Enriquez and Dan Faimen share the remaining 80% as they see fit.

(B)The following is the shareholder ownership interest in the "Model Obsession" as of the effective date of this agreement: (1) Jonathan Rose has a Ten Percent (10%) interest in the company; (2) Michael Enriquez / Kim Mizuno / Dan Faimen shares the remaining 90% as they see fit.

**Agreement for Company Interest**

3. Profit Distribution

The determination of each Shareholder's distributive share of all items of income, gain, loss, deduction, credit or allowance of the Company for any period or year shall be made in accordance with, and in proportion to, such Shareholder's percentage of Company Interest as set forth in paragraph two (2) of this Agreement.  The cash distribution from operations of the Company shall be distributed on a Quarterly basis.  All revenue of the Company shall be deposited regularly in the Company savings and checking accounts at such bank or banks as shall be selected by the Shareholders of this Agreement.

4. Sale of Assets

Upon any sale, transfer or other disposition of any capital asset of the Company (hereinafter referred to as a "Disposition"), the proceeds of such Disposition shall first be applied to the payment or repayment of any selling or expenses incurred in connection with the Disposition immediately prior thereto; all proceeds remaining thereafter (the "Net Proceeds") shall be retained by the Company or be distributed, at such time or times as shall be determined by the Shareholders of this Agreement to this Shareholders in proportion to their respective percentages of Company Interest.

Initials :

$\mathcal{M}E$

5. <u>Legal Title to Company Property</u>

Legal title to the property of the Company shall be held in the name of or in such other name or manner as the Shareholders shall determine to be in the best interest of the Company. It is expressly understood and agreed that the manner of holding title to property (or any part thereof) of the Company is solely for the convenience of the Company, and that all such property shall be treated as Company property subject to the terms of this Agreement.

6. <u>Inspection of Books and Records</u>

The Company books shall be maintained at the location of the registered agent, and each Shareholder shall at all times have access thereto. Upon reasonable notice to the registered agent, each Shareholder shall have access at all times of all the Company's books and records. The books shall be kept on a fiscal year basis, commencing January 1, of each calendar year and ending December 31, of each calendar year, and shall be closed and balanced at the end of each fiscal year. An audit shall be made as of the closing date.

7. Jonathan Rose / Michael Enriquez agree:

(a) That for a period of six (6) months "after" the Social Networking Project launches that Fifty Percent (50%) of the NET profits before distribution will be applied to the completion of the Model Obsession Project with a Ninety Day extension if necessary

(b) That all of the above restrictions and conditions will also apply to all aspects of the Model Obsession project.

(c) That the creation of all necessary Corporate Entity and Shareholder representations to apply towards the Social Networking Project will be completed no later than 60 days from the date of this agreement and before the "Hard Launch" of the project.

(d) That the addition of Jonathan Rose to the shareholder agreement for Model Obsession will be executed within 60 days of the date of this agreement.

Initials:

**Agreement of Company Interest**

8 <u>Default</u>:  This Agreement is further subject to termination by Jonathan Rose should any of the following "Events of Default" occur:

(a)     Any representation, statement, or other information provided by Company or its agents, including but not limited to the statements made in this Agreement, are materially false or materially misleading as given; or

(b)     It is determined by Jonathan Rose, in his sole discretion, that the Company or their agents or representatives have committed fraud, material acts or omissions of dishonesty, moral turpitude or criminal acts or omissions;

(c)     That the Shareholders or Company have defaulted in the performance of any of its promises made to Jonathan Rose under this Agreement.

9.  <u>Attorney's Fees</u>:  The prevailing party in any litigation between the parties relating to this Agreement shall be entitled to reasonable attorneys' fees and court costs, including appellate costs, from the other party.

.10.  Governing Law, Jurisdiction, Venue and Parties:  This Agreement shall be governed, construed and enforce exclusively in accordance with the laws of the State of California.  The Parties hereto hereby irrevocably submit and agree that the Court of Los Angeles County, California and/or the Federal District Court for the Southern District of California shall be the exclusive venue to bring any suit, action or proceeding arising out of or relating to this Agreement, and hereby waive any and all objections to jurisdiction or venue.

11.  <u>General Terms</u>:  Except as specifically stated in paragraph seven (7) as it relates to the Promissory Note executed by Michael Enriquez, this Agreement is the entire agreement between the Parties, superseding all prior proposals both oral and written, negotiations, representations, commitments and other communications between the parties and may only be amended or modified in writing.  This Agreement shall be strictly confidential.  No failure by either party hereto at any time to give notice of any breach by the other party or, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions.

Initials:

_M.E._

60

12. Execution:  This Agreement may be executed in counterparts and any execution of the Agreement by facsimile shall be valid and binding upon the parties.

13. Ambiguities:  In the even ambiguity or question of intent or interpretation arises in this Agreement, this Agreement shall be construed as drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**Agreement of Company Interest**

14. Effective Date:  The parties have agreed that this Agreement shall be effective as of the Effective Date.

15. <u>Notices:</u>

>Jonathan Douglas Rose
>13700 Marina Pointe Dr.
>Suite #: 626
>Marina Del Rey, Ca. 90292

The undersigned hereby represents that he is fully authorized to execute this Agreement and is in full agreement with all terms stated herein.

Attested by:                                      Michael Enriquez

9   FEB 09

Date

61

# EXHIBIT 3

Check: 3093 Amount: $20,000.00 Date: 3/11/2009
Run: 2, Batch: 2, Seq: 16



Check: 3093 Amount: $20,000.00 Date: 3/11/2009
Run: 2, Batch: 2, Seq: 16



Check: 3079 Amount: $25,000.00 Date: 2/11/2009
Run: 1, Batch: 15, Seq: 153



Check: 3079 Amount: $25,000.00 Date: 2/11/2009
Run: 1, Batch: 15, Seq: 153

# EXHIBIT 4

# FIDELITY

## OUTGOING - WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

Date: 3.20.9

Type of WT: U.S. Deposit ☐   Foreign Debit ☐   Time: 10:30 AM

Prepared By: _(signature)_   Seq #: 20.00   Page: 13

Branch/Dept Notification: _(signature)_

Supporting WT Documentation Attached: Yes ☐   No ☐

Additional Info: _(signature)_

Caf Bank Giver / Caf Bank profiled by:

Fidelity Customer Name: _____

**Fidelity Bank Requesting Customer / Originator / Sender**

JONATHAN ROSE

Spoke to: _____   Yes ☐   No ☑

---

Wire / Funds Transfer Dollar Amount: $   32,000.00

Type of Foreign Currency: _____

**WT Authorization & Input**

OFAC Verification By:   Date: __/__/__   Time:

Proceed to FRB:   Date: __/__/__   Time:

WT Execution Approval:

WT Input to FRB By:   FRB Repetitive Code:

WT Verified / Executed to FRB By:

WT Supervisory Review:

Processed on all Systems:   Date: __/__/__   Time:

JH Input By:   JH Repetitive Code:

Notification: Swift ☐   Fed ☐   Copy ☐

Fax Wire:

---

**Beneficiary / Receiving Bank**

ABA Routing # / Swift #: 1 2 1 0 0 0 2 4 2

Bank Name: WELLS FARGO

Bank Address / Branch Info: 2650 W HORIZON RIDGE
702 616 2472

Bank Short/Telgraph Name: _____

**Beneficiary / Receiver of WT**

Beneficiary Name: BHOP COMULTING

Address: 2505 ANTHEM VILLAGE DR
HENDERSON NV

Beneficiary Account Number: 397 786 2446

For Further Credit / (For Final Credit / FI to FI Info / Originator to Beneficiary Info:

_____

HENDERSON NV 89052
#E
342

---

**Department Use ONLY**

**Correspondent Bank Info (Foreign WT's ONLY)**

Place Call to Correspondent Bank:   Date: __/__/__   Time:

Correspondent Bank Routing #

Correspondent Bank Name:

Correspondent Bank Contact:

Correspondent Bank Reference / Sequence #

Intermediary Bank Routing #

Intermediary Bank Name:

Additional Info:

64

# FIDELITY

## OUTGOING - WIRE / FUNDS TRANSFER

The undersigned originator requests payment to be made to the beneficiary or account named below. To the extent not prohibited by law, the undersigned agrees that this bank (sender) is irrevocable and has the sole obligation of the beneficiary, and shall in all respects be liable for any return of, if always under, as or result of any other party's instrument in processing this wire transfer.

### Requesting Branch / Department

| | |
|---|---|
| Date: | 4. 2. 09 |
| Type of WT: | U.S./Domestic ☑  Foreign / Bank ☐  Branch / Dept ☐ |
| Prepared By: | Sherrie |
| Branch/Dept. Authorization: | |
| Supporting WT Documentation Attached: | Yes ☐   No ☑ |
| Additional Info.: | |
| Call back time: | |
| Call back performed by: | Spoke to: |
| Fidelity Customer Name: | Fidelity Bank Requesting Customer / Originator / Sender |

Time: 12:40   Pg: 1
Dr. Jonathan Rose

### Beneficiary / Receiving Bank

| | |
|---|---|
| ABA Routing # / Swift # | 2 1 2 0 0 0 2 4 8 |
| Bank Name: | Wells Fargo Bank |
| Bank Address / Branch Info: | 260 Washington |
| | Ardmore NV 8502 |
| | 702 010 2488 |
| Bank Short/Integrib Name: | |
| | Beneficiary / Receiver of WT. |
| Beneficiary Name: | 212-359-8000   212-359-8008 |
| | LHOP Consulting |
| Address: | 205 Fortune Wild Dr. E: 340 |
| | Ardmore NV 8502 |
| Beneficiary Account Number: | 397906248O |

For Further Credit / For Final Credit / Fi to Fi Info / Originator to Beneficiary Info:

WT Instructions

---

### Wire / Funds Transfer Dollar Amount: $

**22,000.00**

Type of Foreign Currency:

### WT Authorization & Report

| | |
|---|---|
| OFAC Verification By: | Date: __/__/__   Time: |
| Processed to FRB: | Date: __/__/__   Time: |
| Processed Approval: | |
| WT Input to FRB By: | FRB Repetitive Code: |
| WT Verified / Executed to FRB By: | |
| WT Supervisory Review: | |
| Processed on JH System: | Date: __/__/__   Time: |
| JH Input By: | JH Repetitive Code: |
| Notification/Accounting: Copy ☐ | |

### Accounting / Wire Department Use ONLY

| | |
|---|---|
| Correspondent Bank Info (Foreign WT's ONLY) | |
| Phone Call to Correspondent Bank: | Date: __/__/__   Time: |
| Correspondent Bank Routing #: | |
| Correspondent Bank Name: | |
| Correspondent Bank Contact: | |
| Correspondent Bank Reference / Sequence # | |
| Intermediary Bank Routing # | |
| Intermediary Bank Name: | |
| Additional Info.: | |

65

# FIDELITY

# OUTGOING - WIRE / FUNDS TRANSFER

The undersigned customer requests and authorizes the funds to be made to the beneficiary or account number listed below, for the method and conditions set forth by the customer and authorized by law. Customer acknowledges that Fidelity takes transfer of funds in immediate currency can be processed the same business day and that it is not responsible for any losses or changes which occur due to any delay or Fidelity's inability to process this wire transfer.

## Requesting Branch Department

| | | |
|---|---|---|
| Date: 4.15.09 | | Time: 9:14AM |
| Type of WT: U.S. / Domestic ☑  Foreign / Intl ☐ | | Fed # |
| Prepared By: | | Branch / Dept: 13 |
| Beneficiary Authenticated: | | |
| Requesting WT Denomination Amount? | Yes ☐ | No ☑ |
| Additional Info: | Spoke to: | |

Call back done: ___
Call back performed by: ___

Fidelity Bank Requesting Customer / Originator / Sender

Fidelity Customer Name: Jon ATHAN Role

Wire / Funds Transfer Dollar Amount: $  85,000

## Beneficiary / Receiving Bank

ABA Routing # / Swift #  L 2 1 0 0 0 2 4 8

Bank Name: WELLS FARGO BANK

Bank Address / Branch Info: 2650 W. HORIZON RIDGE
Henderson, NV P9053
702-616-7472

Bank Short / Telegraph Name:

## Beneficiary / Receiver of WT

Beneficiary Name: LHOP ConSulTING

Address: 1505 ANTHEM VILLAGE DR
HENDERSON, NV P9052 #E-342

Beneficiary Account Number: 397 902 7420

For Further Credit / For Final Credit (Ft to Ft Info / Originator to Beneficiary Info:

WT Instructions

## WT Authorization & Input

## ACCOUNTING / Wire Department Use ONLY

Correspondent Bank Info (Foreign WT's ONLY)

| | |
|---|---|
| Phone Call to Correspondent Bank: | Date: ___/___/___   Time: |
| Correspondent Bank Routing #: | |
| Correspondent Bank Name: | |
| Correspondent Bank Contact: | |
| Correspondent Bank Reference / Sequence #: | |
| Intermediary Bank Routing # | |
| Intermediary Bank Name | |
| Additional Info: | |

OFAC Verification By: ___   Date: ___/___/___   Time:
Processed to FRB: ___   Time:
WT Execution Approved:
WT Input to FRB By: ___   FRB Repetitive Code:
WT Verified / Executed to FRB By:
WT Supervisory Review:
Processed on JH / Dynamic   Date: ___/___/___   Time:
Notification + Accounting   Copy ☐
JH Input By: ___   JH Repetitive Code:
Fax Wire:

# //// FIDELITY

The undersigned originator requests payment to be made to the beneficiary or account named herein. The bank named above is hereby authorized to charge the account indicated below to be made as set forth above.

## OUTGOING - WIRE / FUNDS TRANSFER

### Requesting Branch / Department

| | |
|---|---|
| Date: | 4.27.9   Time:   11 AM |
| Type of WT: | U.S. / Domestic ☑   Foreign / Intl ☐ |
| Prepared By: | M1   Branch / Dept:   13 |
| Branch/Dept. Authorization: | M1   Guy PRONOVICH |
| Requesting WT Denomination (Market?) | Yes ☐   No ☐ |
| Additional Info: | |
| Call Back done: | |
| Call Back performed by: | Spoke to: |

### Fidelity Bank Requesting Customer / Originator / Sender

| | |
|---|---|
| Fidelity Customer Name: | GUATHAN ROSE |
| Address: | |
| Fidelity Customer Account Number to Clear: | |
| Fidelity Customer Phone Number: | |

Wire / Funds Transfer Dollar Amount: $ | 110,000.00

Type of Foreign Currency:

### WT Authorization & Input

| | |
|---|---|
| OFAC Verification By: | |
| Processed to FRB: | Date:   /   /   Time: |
| FRB Execution Approval: | |
| WT Input to FRB By: | FRB Repetitive Code: |
| WT Verified / Executed to FRB By: | |
| WT Repetitive Number: | |
| Processed on JH-I System: | Date:   /   /   Time: |
| Input By: | JH Repetitive Code: |

### Accounting / Wire Department Use ONLY

| | |
|---|---|
| Manager: | Review □ |
| Teller: | Copy □ |

### Beneficiary / Receiving Bank

| | |
|---|---|
| ABA Routing # / Swift #: | L2-L0 0021 4 L |
| Bank Name: | WELS FARGO |
| Bank Address / Branch Info: | 2650 W. Horizon RIDGE |
| | HENDERSON NV 89052 |
| | ZIP LIB 89052 |
| Bank Short/Telegraph Name: | |

### Beneficiary / Receiver of WT

| | |
|---|---|
| Beneficiary Name: | LHOP CONSULTING |
| Address: | 2505 ENTHEMVILLAGE |
| | HENDERSON NV |
| Beneficiary Account Number: | 3979062410 f9052 |
| | PR |

For Further Credit / For Final Credit / FI to FI Info / Originator to Beneficiary Info:

WT Instructions:

### For WT Use ONLY

| | |
|---|---|
| Phone Call to Correspondent Bank: | Date:   /   /   Time: |
| Correspondent Bank Routing #: | |
| Correspondent Bank Name: | |
| Correspondent Bank Contact: | |
| Correspondent Bank Reference / Sequence #: | |
| Intermediary Bank Routing #: | |
| Intermediary Bank Name: | |
| Additional Info: | |

Correspondent Bank Info (Foreign WT's ONLY)

# OUTGOING - WIRE / FUNDS TRANSFER

**/// FIDELITY**

The undersigned originator requests payment to be made to the beneficiary (or receiver named below). The undersigned authorizes Fidelity to process this transfer, and agrees that Fidelity is not responsible for any mistakes or delays which occur as a result of any party's instructions.

## Requesting Branch / Department

| | | | |
|---|---|---|---|
| Date: | U.S./Domestic ☑ | Time: | 10:30 AM |
| Type of WT: | Foreign/Intl ☐ | Rec's | 22.00 |
| Prepared By: | Branch / Dept: | | |
| Beneficiary Authorization: | | | |
| Beneficiary WT Documentation Attached? | Yes ☐ | | No ☐ |
| Additional Info: | | | |

Date: 5.11.09

## Fidelity Bank Requesting Customer / Originator / Sender

Fidelity Customer Name: JONATHAN ROSE          Spele for:

## Beneficiary / Receiving Bank

Bank Name: WELLS FARGO          ABA Routing # / Swift # L L L A A 2 7 2

Bank Address / Branch Info: 9650 W. HORIZON RIDGE

HENDERSON NV 89052

Bank Short/Telgraph Name: 702 616 2470

## Beneficiary / Receiver of WT

Beneficiary Name: LHO CONSULTING

Address: 2565 ANTHEM VILLAGE

HENDERSON NV

Beneficiary Account Number: 3979062470

For Further Credit / For Final Credit / FI FI Info / Originator to Beneficiary Info:

Wire / Funds Transfer Dollar Amount: $

**$ 117,000.00**

## WT Authorization & Input

| | | |
|---|---|---|
| OFAC Verified By: | Date: ___/___/___ | Time: |
| Processed to FRB: | Date: ___/___/___ | Time: |
| WT Execution Approval: | | |
| | FRB Repetitive Code: | |
| WT Verified / Checked to FRB By: | | |
| WT Supervisory Review: | | |
| Processed on /WT Repetitive: | Date: ___/___/___ | Time: |
| | JH Repetitive Code | |

## Accounting / Wire Department Use ONLY

### Correspondent Bank Info (Foreign WT's ONLY)

| | |
|---|---|
| Please Call Correspondent Bank: | Date: ___/___/___ Time: |
| Correspondent First Routing #: | |
| Correspondent Bank Name: | |
| Correspondent Bank Contact: | |
| Correspondent Bank Reference / Sequence #: | |
| Intermediary Bank Routing #: | |
| Intermediary Bank Name: | |
| Additional Info: | |

| | | |
|---|---|---|
| Date: | | |
| Prepared By: | | |
| WT Execution Approval: | | |
| WT Input to FRB By: | | |
| WT Verified / Checked to FRB By: | | |
| Processed on /WT Repetitive: | Date: | |
| JH Input By: | | |
| Notifications / | Accounting ☐ | Copy ☐ |

# OUTGOING - WIRE / FUNDS TRANSFER

**FIDELITY**

## Requesting Branch / Department

Date: 5/27/09  Time: 10:45am

Type of WT: U.S. / Domestic ☑  Foreign / Intl ☐

Prepared By: JK

Branch/Dept. Authorization: TM

Outgoing WT Documentation Attached? Yes ☐  No ☐

Additional Info:

Call Back Sent:
Call Back Time:

Fidelity Bank Requesting Customer / Originator / Sender

Fidelity Customer Name: GW ATHIAN ROSE

Spoke to:

Wire / Funds Transfer Dollar Amount: $ 88,000

## Beneficiary / Receiving Bank

ABA Routing # / Swift #: 122 202 41 6

Bank Name: WELLS FARGO

Bank Address / Branch Info: 2650 W. HORIZON RIDGE
HENDERSON NV 89052

Bank Street/Telegraph Name:

Beneficiary Name: LHOR COUVETING

Address: 2505 ANTHEM VILLAGE
HENDERSON, NV
89052

Beneficiary Account Number: 3979629740

For Further Credit / For Final Credit / FIs to FIs / Originating to Beneficiary Info:

WT Instruction

## Accounting / Wire Department Use ONLY

WT Authorizations & Input

OFAC Verification By:  Date: / /  Time:
Processed to FRB:  Date: / /  Time:
Processed to FRB:  Date: / /  Time:  FRB Repetitive Code:
WT Execution Approval:
WT Input to FRB By:  FRB Repetitive Code:
WT Verified / Executed to FRB By:
WT Supervisory Review:
Processed on JH System:  Date: / /  Time:
Holdback? JH System:  Date: / /  Time:  JH Repetitive Code:
Re-Value:
Holdback ☐  Pending ☐  Only ☐

### Correspondent Bank Info (Foreign WT's ONLY)

Please Call to Correspondent Bank:  Date: / /  Time:
Correspondent Bank Routing #:
Correspondent Bank Name:
Correspondent Bank Contact:
Correspondent Bank Reference / Sequence #:
Intermediary Bank Routing #:
Intermediary Bank Name:
Additional Info:

# FIDELITY

## OUTGOING - WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

Date: 6.10.9  Time: 2:45p

Type of WT: USA (Dept) ☑  Foreign / Int'l ☐   Pct.): 13

Prepared By: AW

Requesting WT Documentation Attached: Yes ☐  No ☐

**Fidelity Bank Requesting Customer / Originator / Sender**

Fidelity Customer Name: JONATHON ROSE

Wire / Funds Transfer Dollar Amount: $ 6,000.00

**Beneficiary / Receiving Bank**

ABA Routing # / Swift #: 121 000 248

Bank Name: WELLS FARGO

Bank Address / Branch Info: 9650 W. Horizon Rid, Henderson NV 89052

**Beneficiary / Receiver of WT**

Beneficiary Name: LHOP CONSULTING

Address: 2505 ANTHEM VILLAGE, HENDERSON NV 89052 DR

Beneficiary Account Number: 397906 2460

**WT Authorization & Input**

**Accounting / Wire Department Use ONLY**

# FIDELITY

## OUTGOING - WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

| Field | Value |
|---|---|
| Date | 7.30.09 |
| Type of WT: | U.R. / Domestic ☐  Foreign / Intl ☐ |
| Time | 10:46 AM |
| Prepared By: | 4 |
| Branch / Dept. | 52 |
| Approved By: | 13 |
| Operating WT Commission Amount) | |
| Added Info: | |

Call Back Date:
Call Back Initials:

Followed by: _____  Spoke to: _____  Yes ☐  No ☑

Party Contact Name: _____

**Fidelity Bank Requesting Customer / Originator / Sender**

Name: JONATHON ROSE

Address: _____

Wire / Funds Transfer Dollar Amount: $ 35,000.00

**Beneficiary / Receiving Bank**

ABA Routing # / Swift # : 121000248
Bank Name: WELLS FARGO
Bank Address / Branch Info: 2650 W. HORIZON RDG
HENDERSON NV
702612747 89052

**Beneficiary / Receiver of WT**

Beneficiary Name: 6101 CONSULTING
Address: 2505 ANTHEM VILLAGE
HENDERSON NV 89052
Beneficiary Account Number: 397906840

**WT Instructions**
Per Further Credit / For Final Credit / FB to FI rate / Originator to Beneficiary Info:

_____

**Correspondent Bank Info (Foreign W/Ts ONLY)**

Phone Call to Correspondent Bank: _____  Date __/__/__  Time _____
Correspondent Bank Routing # : _____
Correspondent Bank Name: _____
Correspondent Bank Contact: _____
Intermediary Bank Reference / Sequence # : _____
Intermediary Bank Name: _____
Additional Info: _____

**WT Authorization & Input**

WT Authorized By: _____  Date __/__/__  Time: _____
Processed to FRB: _____  FRB Repetitive Code: _____
WT Executed Approved: _____
WT Input to FRB Re: _____
WT Verified / Executed to FRB Re: _____
WT Supervisory Revu: _____
Processed on JH / Sys Int.: _____  Date __/__/__  Time: _____
Notification to Accounting: _____  JH Repetitive Code: _____
JH Input By: _____
(see reverse side)  Copy ☐

**Accounting / Wire Department Use ONLY**

# WIRE / FUNDS TRANSFER

## "OUTGO"

The undersigned represents and agrees to be made (or beneficiary or correct number listed below). The undersigned claims to be relieves ordinary care in processing wire transfer and hold it not responsible for any losses or damages which result as a result of any slight or any of the transfers...

### Requesting Branch / Department

| | | |
|---|---|---|
| Date: 2.13.09 | Time: 9:04p | |
| Type of WT: U.A./Domestic ☑ | Foreign / Book ☐ | |
| Prepared By: TM | Branch/Dep: 13 | Fax: 2.22 |
| Routings / Authorization: TM GW PRONOUNCH | | |
| Requesting WT Cancellation Attached? Yes ☐ | | No ☐ |
| Additional Info: | | |

Call Back Name: _____ Spoke to: _____
Call Back Number: _____

### Fidelity Bank Requesting Customer / Originator / Sender

Fidelity Customer Name: JONATHAN ROSE

Address: _____

Wire / Funds Transfer Dollar Amount: $ **35,000 00**

Type of Foreign Currency: _____

### Accounting / Wire Department Use ONLY

OFAC Verification By: _____ Date: __/__/__ Time: _____
Processed to FRB: Date: __/__/__ Time: _____
WT Execution Approval: _____ FRB Republine Code: _____
WT Input to FRB By: _____
WT Verified / Executed to FRB By: _____
WT Repository Review: _____
Processed on AV System: Date: __/__/__ AV Republine Code: _____
AV Input By: _____ Time: _____
Notification to Accounting: Copy ☐
For Wire for Customer

### WT Authorization & Input

_____

### Beneficiary / Receiving Bank

ABA (Routing #) / Swift #: 1 2 1 0 0 0 2 4 8
Bank Name: WELLS FARGO
Bank Address / Branch Info: 2650 W. HORIZON RIDGE
HENDERSON NV
70616347471 89052

Bank Short/Program Name: _____

### Beneficiary / Receiver of WT

Beneficiary Name: LHOP CONSULTING
Address: 9505 ANTHER WLK AIR
HENDERSON NV 59052

Beneficiary Account Number: 3979062420

### WT Destination
For Further Credit / For Final Credit / FI to FI Info / Originator to Beneficiary Info:

_____

### Correspondent Bank Info (Foreign WT'S ONLY)

Phone Call to Correspondent Bank: Date: __/__/__ Time: _____
Correspondent Bank (Routing #): _____
Correspondent Bank Name: _____
Correspondent Bank Contact: _____
Correspondent Bank Reference / Sequence #: _____
Intermediary Bank (Routing #): _____
Intermediary Bank Name: _____
Additional Info: _____

# FIDELITY

## OUTGO" - WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

| | |
|---|---|
| Date: | 9.1.09 |
| Type of WT: | WT/Onetime ☐  Time: 3:25 PM |
| Prepare By: | Foreign / Draft ☐  Fee: $22.00 |
| Guv Provoucht | Branch / Dept. /3 |
| Sent/Red. Authentication: | Yes ☐  No ☑ |
| Responding WT Documentation Attached? | Yes ☐  No ☑ |
| Additional Info: | |

Call Back Done: 
Call Back performed by:

**Fidelity Bank, Requesting Customer / Originator / Sender**

Fidelity Customer Name: JONATHAN ROSE

$ 30,000.00

**Beneficiary / Receiving Bank**

| | |
|---|---|
| ABA Routing # / Swift # | 1 2 1 0 0 0 2 4 8 |
| Bank Name: | WELLS FARGO |
| Bank Address / Branch Info: | 2650 W. HORIZON RIDGE |
| | HENDERSON NV 89052 |
| | 702-876-2450 |

Bank Short/Telegraph Name:

**Beneficiary / Receiver of WT**

| | |
|---|---|
| Beneficiary Name: | LHOP CONSULTING |
| Address: | 7505 ANTHEM VILLAGE |
| | HENDERSON NV 89052 |
| Beneficiary Account Number: | 397-906-2410 |

**Accounting / Wire Department Use ONLY**

Wire / Funds Transfer Dollar Amount: $

Type of Foreign Currency:

Correspondent Bank Info (Foreign WT'S ONLY)

Please Call to Correspondent Bank:   Date: __/__/__   Time:
Correspondent Bank Routing #:
Correspondent Bank Contact:
Correspondent Bank Reference / Sequence #:
Intermediary Bank Routing #:
Intermediary Bank Name:
Additional Info:

**WT Authorization & Input**

| | | |
|---|---|---|
| Processed to FRB: | Date: __/__/__ | Time: |
| WT Execution Approval: | | |
| WT Input to FRB By: | | |
| WT Verified / Executed to FRB By: | | FRB Repetitive Code: |
| WT Supervisor Review: | | |
| Proposed on JH / System: | Date: __/__/__ | Time: |
| JH Input By: | | |
| Notification to Accounting: | | JH Repetitive Code: |
| | | Copy ☐ |

OFAC Verification By:   Date: __/__/__   Time:
Processed to FRB:

WT Instructions
For Further Credit / For Final Credit / Fin FI Info / Originator to Beneficiary Info:

## OUTGOING – WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

- Date: 9.11.09
- Type of WT: U.S. Domestic ☑   Foreign / Intl ☐   Time: 10:55AM   Fee: 25.00
- Prepared By: Gov Pronovati   Branch / Dept: 13

**Requesting Customer / Originator / Sender**

- Public Customer Name: JONATHAN ROSE
- Depositing WT Documentation Attached? Yes ☐  No ☑

WT Authorization & Input — WT Amount: $ 25,000.00

**Beneficiary / Receiving Bank**

- ABA Routing #/Swift #: 121000248
- Bank Name: WELLS FARGO
- Bank Address / Branch Info: 2650 W. HORIZON RD. Doc
  HENDERSON NV 89052
  702-616-2422

**Beneficiary / Receiver of WT**

- Beneficiary Name: KHOP CONSULTING
- Address: 505 ANTHEM VILLAGE
  HENDERSON NV 89052
- Beneficiary Account Number: 397-966-2420

Accounting / Wire Department Use ONLY

74

# OUIG?" ¡- WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

Date: 10.24.09  Time: 2:30

Type of WT: U.S./Domestic ☑  Foreign/Intl ☐

Prepared By: Guy Pragier  Batch Dept: 13  Fee's: 26.00

Routing Authorized:

Sending WT Documentation Attached? Yes ☐  No ☑

Batch Sheet/Template Name:

**Fidelity Bank Requesting Customer / Originator / Sender**

Firm/Customer Name: Jonathan Rose

Spoke to:

Call back date:

Type of Foreign Currency:

**Wire / Funds Transfer Dollar Amount: $ 24,000.00**

**Beneficiary / Receiving Bank**

ABA Routing # / Swift: 121000248

Bank Name: Wells Fargo

Bank Address / Branch Name: 2650 W Horizon R... Henderson, NV 89052
7026767 8 4PD

**Beneficiary / Receiver of WT**

Beneficiary Name: AHGV Consulting

Address: 2505 Authers Village C Henderson, NV 89052

Beneficiary Account Number: 797-806-8480

WT Instructions

For Positive Credit / First Final Credit / FI to FI into / Originator to Beneficiary Info:

Intermediary Bank Name:
Additional Info:

**WT Authorization & Input**

OFAC Verification By:  Date: __/__/__  Time:

Processed by FFB:  Date: __/__/__  Time:

Processed & Approved:

WT Execution Approval:

WT Input to FRB By:

WT Verified / Cleared to FRB By:  FRB Repetitive Code:

Posted to AW System:  Date: __/__/__  Time:

Posted on AW System:  Date: __/__/__  Time:

Notation to Accounting:  AW Repetitive Code:

Wire  Copy ☐

**Accounting / Wire Department Use ONLY**

Correspondent Bank (Foreign WT's ONLY)

Correspondent Bank Routing #:
Correspondent Bank Name:
Correspondent Bank Contact:
Correspondent Bank Reference / Sequence #:
Intermediary Bank Routing #:
Intermediary Bank Name:
Additional Info:

Phone Call to Correspondent Bank:  Date: __/__/__  Time:

# FIDELITY

## OUTGOING WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

Date: 12.16.09   Time: 11:07

Type of WT: US (Domestic) ☑   Foreign ☐   Fed ☐

Prepared By: Guy Rexroult   Branch/Dept: 13

Received WT Documentation Attached? Yes ☐   No ☑

**Fidelity Customer Name / Originator / Sender**

Fidelity Customer Name: Jonathan Rose

Wire / Funds Transfer Dollar Amount: $ 27,000

**WT Authorization & Input**

OFAC Verification By:

Forward to FRB:   Date: __/__/__   Time: ___

WT Execution Approval:

WT Input to FRB By:   FRB Repetitive Code: ___

WT Verified / Executed to FRB By:

WT Repetitive Review:

Posted on JH / System:   Date: __/__/__   Time: ___

Notification to Accounting:   JH Input By:   JH Repetitive Code: ___

Copy ☐

**Accounting / Wire Department Use ONLY**

Phone Call to Correspondent Bank:   Date: __/__/__   Time: ___

Correspondent Bank Pending #:

Correspondent Bank Contact:

Correspondent Bank Reference / Sequence #

Intermediary Bank Routing #:

Intermediary Bank Name:

Additional Info:

**Beneficiary / Receiving Bank**

ABA / Routing / Swift: 1 2 1 0 0 0 2 4 8

Bank Name: Wells Fargo

Bank Address / Branch #: 2650 W. Horizon Ridge

Henderson, NV P0052

702 816 2458

Bank Short / Foreign Name:

**Beneficiary / Receiver of WT**

Beneficiary Name: Lthof Conдulting

Address: 2505 Authetic Village Dr

Henderson, NV P0052, #E 342

Beneficiary Account Number: 397 916 2466

**WT Instructions**

For Further Credit / For Final Credit / FFI to FT Info / Originator to Beneficiary Info:

# OUTGOING - WIRE / FUNDS TRANSFER

**Fidelity**

## Requesting Branch / Department

Date: 12.21.09  Time: 9:40 AM
Type of WT: U.A. / Domestic ☑  Foreign / Intl ☐  Branch / Dept: 15  Fee: 22
Prepared By: _(signature)_
Branch/Dept. Authorization: _(signature)_ Yes ☐ No ☐
Requesting WT Documentation Attached? Yes ☐ No ☐
Additional Info:

Call Back Time:
Call back performed by:
Fidelity Bank Requesting Customer Name: Jonathan Rose  Spoke to:

## Beneficiary / Receiving Bank

ABA Routing # / Swift #: 121000248
Bank Name: Wells Fargo
Bank Address / Branch Info: 2650 W Horizon Ridge
Henderson, NV 8905-
Bank Staff/Relgm Name: 702-616-2082

## Beneficiary / Receiver of WT

Beneficiary Name: LLOP Consulting
Address: 2505 Anthem Village Dr #E 342
Henderson NV 89052
Beneficiary Account Number: W655211559
WT Instructions: (6655415559)
For Further Credit / For Final Credit / FI to FI Info / Originator to Beneficiary Info:

**Wire / Funds Transfer Dollar Amount: $ | 17,500 |**

## Accounting / Wire Department Use ONLY

WT Authorization & Input

OFAC Verification By: ___ Date: _/_/_ Time: ___
Processed to FRB: ___ Date: _/_/_ Time: ___
WT Execution Approval: ___
WT Input to FRB By: ___ FRB Repetitive Code: ___
WT Verified / Executed to FRB By: ___
WT Repetitive Review: ___
Processed as JH / System: ___ Date: _/_/_ Time: ___
JH Input By: ___ JH Repetitive Code: ___
Notification to Accounting: Copy ☐

### Correspondent Bank Info (Foreign WT's OFAC'd)

Phone Call to Correspondent Bank: ___ Date: _/_/_ Time: ___
Correspondent Bank Routing #: ___
Correspondent Bank Name: ___
Correspondent Bank Contact: ___
Correspondent Bank Reference / Response #: ___
Intermediary Bank Routing #: ___
Intermediary Bank Name: ___
Additional Info: ___

77

# OUTGOING - WIRE / FUNDS TRANSFER

**/// FIDELITY**

## Requesting Branch / Department

Date: 3.1.10  Time: 4:55 p/o

Type of WT: US Domestic ☐  Foreign / Int'l ☐  WT # 13

Prepared By: Guy Prochilo

Bank/Dept. Authorization: OK

Requesting WT Documentation Attached?  Yes ☐  No ☑

Additional Info:

Call Back Made:

Called Back By:  Spoke to:

## Fidelity Bank Requesting Customer / Originator / Sender

Fidelity Company Name: Jonathan Rose

**WT / Funds Transfer Dollar Amount:  $ 52,500.00**

## Beneficiary / Receiving Bank

ABA Routing # / Swift #: 121042882

Bank Name: WELLS FARGO

Bank Address / Branch Info: 2650 W. Horizon Ridge
Henderson NV 89052
702-676-3400

Bank Short / Fed/right Name:

### WT Instructions

For Further Credit / For Real Credit / FI to FI Info / Originator to Beneficiary Info:

Beneficiary Name: 246 P Century Villag
2505 Px Thorn Village
Henderson, CA 90033
#E 342

Beneficiary Account Number: 3879062418

## WT Authorization & Input

OFAC Verification By:  Date:

Proceed to FRB:  _/_ / _  Time:

WT Execution Approval:

WT Input to FRB By:  FRB Repetitive Code:

WT Verified / Executed to FRB By:

WT Depository Review:

Proceed on JH / System:  Date: _/_ / _  Time:

Notification to Accounting:  Copy ☐

## Accounting / Wire Department Use ONLY

### Correspondent Bank Info (Foreign WT'S ONLY)

Please Call to Correspondent Bank:  Date: _/_ / _  Time:

Correspondent Bank Routing #:

Correspondent Bank Name:

Correspondent Bank Contact:

Correspondent Bank Reference / Sequence #:

Intermediary Bank Routing #:

Intermediary Bank Name:

Additional Info:

# FIDELITY

## OUTGO... - WIRE / FUNDS TRANSFER

**Date:** 7.13.10  **Time:** 9:30 AM  **Pri:** 22 oo

**Beneficiary / Originator / Sender:** JONATHAN ROSE

**Amount:** $ 109,000.00

**ABA Routing # / Date:** 121000248
**Bank Name:** WELLS FARGO
**Bank Address / Branch Info:** 2650 W. Harizon R106E Henderson NV 89052
**Bank Acct / Account Number:** 7062862442

**Beneficiary / Receiver of WT:** LHOP CONSULTING
**Address:** 2660 ANTHEM VILLAGE DR #E 342 Henderson NV 89052
**Account Number:** 397802242490, 89052

#E 342

# FIDELITY

## OUTGOING WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

| Date | 7.19.10 | Time | 3:29 PM |
| Type of WT: | U.S. / Domestic ☑ | Foreign / Intl ☐ | Fee: 22.00 |
| Proceed By: | AH | Branch / Dept: | #13 |

Branch/Dept. Authorized by: GUY PRONOVICH

Requesting WT Documentation Attached?   Yes ☐   No ☐

Additional Instr:

Call back done ☐
Call back performed by: _____ Spoke to: _____

Fidelity Customer Name: JONATHAN ROSE

Type of Foreign Currency: _____

Wire / Funds Transfer Dollar Amount: $ **4,000.00**

---

**Accounting / Wire Department Use ONLY**

WT Authorization & Input

| OFAC Verification By: | | Date ___/___/___ | Time: ___ |
| Processed to FRB: | Date ___/___/___ | | Time: ___ |
| WT Execution Approved: | | | |
| WT Input to FRB By: | | | FRB Repetitive Code: ___ |
| WT Verified / Secured to FRB By: | | | |
| WT Repetitory Number: | | | |
| Proceed as JH-I System: | Date ___/___/___ | | Time: ___ |
| JH Level By: | | | JH Repetitive Code: ___ |
| Notification to Accounting: | Copy ☐ | | |
| Foreign Account: | | | |

---

**Beneficiary / Receiving Bank**

ABA Routing # / Swift: 1 2 1 0 0 0 2 4 8

Bank Name: WELLS FARGO

Bank Address / Branch Info: 2150 W. HORIZON RIDGE, HENDERSON NV 89052
702.676.2490

Bank Sheet/Telegraph Name: _____

**Beneficiary / Receiver of WT**

Beneficiary Name: LHA? CONSULTING

Address: 2505 ANTHEM VILLAGE,
HENDERSON NV DALE #342
89052

Beneficiary Account Number: 3979062490

WT Instructions
For Further Credit / For Final Credit / FI to FI Info / Originator to Beneficiary Instr:

**Correspondent Bank Info (Foreign WTs ONLY)**

| Please Call to Correspondent Bank: | Date ___/___/___ | Time: ___ |
| Correspondent Bank Routing #: | |
| Correspondent Bank Name: | |
| Correspondent Bank Contact: | |
| Correspondent Bank Reference / Sequence #: | |
| Intermediary Bank Routing #: | |
| Intermediary Bank Name: | |
| Additional Instr: | |

# FIDELITY

## OUTGOING WIRE / FUNDS TRANSFER

The individual completing this form must be made to the beneficiary or correspondent bank listed below. Per the wire being processed, this wire transfer and check it out are agreeing that one of the terms of any of the terms...

### Requesting Branch / Department

Date: 2.22.10
Type of WT: U.S. / Canada ☒   Foreign / Int'l ☐   Time: 12:23 pm
Processed By: N   Proc'd / Ops: #13   Fees: 22.00
Branch / Dept. Authorization: N   Gov   Plonovich
Requesting WT Documentation Attached?   Yes ☐   No ☒
Additional Info:

Cat Bank Name:
Cat Bank Delivered By:
**Fidelity Requesting Customer / Originator / Sender**
Fidelity Contact Name: Jonathan Rose

Spoke to:

### WT / Funds Transfer Dollar Amount: $

```
32,000.00
```

### Beneficiary / Receiving Bank

ABA Routing # / Swift #: 1 2 1 0 0 0 2 4 8
Bank Name: WELLS FARGO
Bank Address / Branch Info: 2650 W
Henderson NV 89052
701 6164452
Bank Short / Long Info Name:

### Beneficiary / Receiver of WT

Beneficiary Name: 6407 Consulting
Address: 2505 Anthem Village
Henderson NV 89052 DRE #342
Beneficiary Account Number: 397 9062480

WT Instructions:
For Further Credit / For Final Credit / FI to FI Info / Originator to Beneficiary Info:

### WT Authorization & Input

Processed to FRB:   Date: __/__/__   Time:
WT Execution Approved:
WT Input to FRB By:
WT Verified / Revised to FRB By:   FRB Repetitive Code:
Requesting WT Repetitive #:
Processed on JH / System:   Date: __/__/__
JH Input By:   Time:
Matched to Accounting?   Copy ☐   JH Repetitive Code:

OFAC Verified to By:

### ACCOUNTING / Wire Department Use ONLY

Phone Call to Correspondent Bank:   Date: __/__/__   Time:
Correspondent Bank Routing # :
Correspondent Bank Name:
Correspondent Beat Contact:
Correspondent Beat Contact:
Correspondent Bank Reference / Sequence #
Intermediary Bank Routing #:
Intermediary Bank Name:
Additional Info:

### Correspondent Bank Info (Foreign WT's ONLY)

# FIDELITY

## OUTGOING - WIRE / FUNDS TRANSFER

The undersigned agrees and acknowledges... [fine print authorization text]

### Requesting Branch / Department

| | |
|---|---|
| Date: | 1.6.10 |
| Type of WT: | U.S. / Domestic ☑  Foreign / Intl ☐ |
| Time: | 3:47 PM |
| Prepared By: | RG&H |  Fed $: 22.00 |
| Benefit/Bank Authorization: | Rogn / Dom / 13 |
| Requesting WT Documentation Attached? | Yes ☐   No ☑ |
| Additional Info: | Guy Monowich |

### Fidelity Bank Requesting Customer / Originator / Sender

| | |
|---|---|
| Fidelity Customer Name: | JONATHAN ROSE |
| Speak to: | |

**Wire / Funds Transfer Dollar Amount:**  $ 25,000.00

### Beneficiary / Receiving Bank

| | |
|---|---|
| ABA Routing # / Swift #: | 121 000 242 |
| Bank Name: | WELLS FARGO |
| Bank Address: | 420 MONTGOMERY |
| Bank Address / Branch Info: | HENDERSON NV 89052 |
| | 702 611 2472 |
| Bank Short/Telegraph Name: | |

### Beneficiary / Receiver of WT

| | |
|---|---|
| Beneficiary Name: | EHG CONSULTING |
| Address: | 2505 ANTHEM VILLAGE |
| | HENDERSON NV 89052 |
| Beneficiary Account Number: | 3979062420 |
| | #342 |

**WT Instructions**
For Further Credit / For Final Credit / FI to FI Info / Originator to Beneficiary Info:

| | |
|---|---|
| Correspondent Bank: | |
| Correspondent Bank (Foreign) #: | |
| Correspondent Bank Name: | |
| Correspondent Bank Contact: | |
| Correspondent Bank Reference / Sequence #: | |
| Intermediary Bank (Posting) #: | |
| Intermediary Bank Name: | |
| Additional Info: | |

### Accounting / Wire Department Use ONLY

| | |
|---|---|
| OFAC Verification By: | |
| Processed to FRB: | Date: _/_/_   Time: |
| WT Execution Approved: | |
| WT Input to FRB By: | FRB Repetitive Code: |
| WT Verified / Executed to FRB By: | |
| WT Repetitive / Review: | |
| Processed on JHT System: | Date: _/_/_   Time: |
| JHT Input By: | JHT Repetitive Code: |
| Notification to Automation: | Copy ☐ |

### WT Authorization & Input

| | |
|---|---|
| Date: | _/_/_   Time: |

Please Call to Correspondent Bank:   Date: _/_/_   Time:
(Correspondent Bank Info (Foreign WT's ONLY))

82

/// FIDELITY

# OUTGOING - WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

Date: 9.9.10   Time: 9:51 AM

Type of WT: WE (Domestic)   Foreign Bank:

Prepared By: Guy Morowich   Ext #13

Branch / Location #:

Recurring / Automatic:

Recurring WT Documentation Attached: ☑   Yes ☐   No ☐

Call Back:

Call Back Performed By:

**Fidelity Bank Requesting Customer / Originator / Sender**

Fidelity Customer Name: JONATHAN ROSE

Spoke to:

Call Back Performed By:

Wire / Funds Transfer Dollar Amount: $ 40,000.00

**Beneficiary / Receiving Bank**

ABA Routing # / Swift #: 121000248

Bank Name: WELLS FARGO

Bank Address / Branch #: 2150 W. Horizon Ridge

Henderson NV 89052

702-616-3400

**Beneficiary / Recipient of WT**

Receiving Name: LHA CONSULTING

Address: 2505 Anthem Village

Henderson NV 89052

Beneficiary Account Number: 397906340

**WT Intermediary**

**For Further Credit / Per Final Credit (FFC to FI Info / Obligation to Beneficiary Info:**

---

**WT Authorization & Input**

| | Date: | Time: |
|---|---|---|
| OFAC Verified By: | | |
| Released to FRB: | | |
| Released to FRB: | | |
| WT Execution Approved: | | |
| WT Input to FRB By: | | FRB Reprofile Code: |
| WT Verified / Executed to FRB By: | | |
| WT Supervisory Review: | | |
| Processed on All System: | Date: | Time: |
| WT Input By: | | JH Reprofile Code: |
| Addition to Accounting: Copy ☐ | | |

**Accounting / Wire Department Use ONLY**

**Correspondent Bank Info (Foreign WT's ONLY)**

| Please Call to Correspondent Bank: | Date: | Time: |
|---|---|---|
| Correspondent Bank Routing #: | | |
| Correspondent Bank Name: | | |
| Correspondent Bank Contact: | | |
| Correspondent Bank Reference / Sequence #: | | |
| Intermediary Bank Routing #: | | |
| Intermediary Bank Name: | | |
| Additional Info: | | |
| Additional Info: | | |

# FIDELITY

## OUTGOING - WIRE / FUNDS TRANSFER

**Date:** 9.13.10  **Time:** 3:49.79

**Type of WT:** U.S. (Domestic)  **Foreign (Int'l)**

**Prepared By:** Guy Prellovich #13

**Beneficiary / Receiver of WT**

**ABA Number / Swift Code:** 121042882
**Bank Name:** Wells Fargo
**Bank Address / Branch:** 9650 W. Horizon Ridge
Henderson, NV 89052
702-818-9452

**Beneficiary Name:** LHOP Consulting
**Address:** 2505 Anthem Village
Henderson, NV Village
Henderson, NV 89052
**Beneficiary / Account Number:** 3970068970

**Customer / Originator / Sender:** JONATHAN Rose

**WT / Funds Transfer Dollar Amount:** $ 20,000.00

### Accounting / Wire Department Use ONLY

WT Authorization & Input

OFAC Verified By: _____ Date: ___/___/___ Time: _____
Processed to FRB: _____ Time: _____
WT Execution Approved: _____
WT Input to FRB By: _____
WT Verified / Executed to FRB By: _____
WT Supervisory Review: _____
Processed on A/I System: _____ Date: ___/___/___ Time: _____
JH Input By: _____
Justification to Accounting: Copy ☐

/// FIDELITY

# OUTGOING - WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

Date: 2.16.16   Time: 11:56 AM   am/pm

Type of WT: Wire Domestic   Foreign/Bank   Branch/Region: 22.00

Prepared By: Guy Proujansky   #13

Executing Authorization: _____

Requestor WT Documentation Attached?   Yes ☐   No ☑

Attach if Yes: _____

Call Back Date: _____
Call Back Performed By: _____

Spoke to: _____

Fidelity Customer Name: Jonathan Rose

**Wire / Funds Transfer Dollar Amount:** $   **$50,000.00**

Type of Foreign Contract: _____

**Beneficiary / Receiving Bank**

ABA Routing # / Bank #: 121 000 248

Bank Name: Wells Fargo

Bank Address / Branch Info: 7650 W Horizon Ridge
Henderson NV 89052
702-616-2422

Bank On/Off Margin Name: _____

**Beneficiary / Receiver of WT**

Beneficiary Name: Phil Coniglio

Address: 2505 Anthem Village
Henderson NV 89052

Beneficiary Account Number: 3970062490

**WT Instruction**
For Further Credit (Fbo First Credit / Fbo to Fbo / Originator to Beneficiary Info)

_____

**WT Authorization & Repair**

Processed for FFRB:   Date: ___/___/___   Time: ___

Processed By:   Date: ___/___/___   Time: ___

WT Execution Approval: _____

WT Input to FRB By: _____   FRB Repetition Code: _____

WT Verified / Executed to FRB By: _____

**Accounting / Wire Department Use ONLY**

Correspondent Bank Info Use ONLY

Prove Cot to Correspondent Bank:   Date: ___/___/___   Time: ___

Correspondent Bank Routing #: _____

Correspondent Bank Name: _____

Correspondent Bank Contact: _____

Correspondent Bank Reference / Reqwire #: _____

Beneficiary Bank Routing #: _____

Beneficiary Bank Name: _____

Beneficiary Bank Address: _____

Additional Info: _____

WT Department Release: _____

OFAC Verification By: _____   Date: ___/___/___   Time: ___

Processed to JH System:   Date: ___/___/___   Time: ___   Total: ___   JH Repetition Code: _____

JH Input By: _____   JH Repetition Code: _____

Verification to Accounting:   Copy ☐

Fee taken (if any): _____

//// FIDELITY

## OUTGOING - WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

Date: 10.21.10
Type of WT: U.S./Foreign □  Time: 10:24  Fed □  Priority (Day) □
Prepared By: SD  Foreign (Day) □  Fed □  Int'l □
Beneficiary Authorization: Guy PRONOVICH
Authorized Via:
Requesting WT Documentation Attached? Yes □  No □
Fidelity Customer Name: Jon ATchen ROSE

Spoke to:

Wire / Funds Transfer Dollar Amount: $ 4,000.00

**Beneficiary / Receiving Bank**
ABA Routing # / Swift #: 122122528
Bank Name: WELLS FARGO
Bank Address / Foreign Info: 2650 W HORIZON RIDGE
  HENDERSON, NV P8952
  702-616-2482
Bank Short/Telegraph Name:

**Beneficiary / Recipient of WT**
Beneficiary Name: LAGI CONSULTING
Beneficiary Address: 9505 ANTHEM VILLAGE
  HENDERSON NV 89052
Beneficiary Account Number: 3879060490

WT Instructions
For Partial Credit / For Final Credit / FI to FI bfo / Originator to Beneficiary bfo:

**Requesting Customer / Originator / Sender**

**WT Authorization & Input**
OFAC Verification By: ___  Date: __/__/__  Time: ___
Processed to FRB: ___
WT Extract Approval: ___
WT Input to FRB Pc:
WT Input to FRB Pc:
WT Verified / Emailed to FRB By: ___
WT Exporting Institution:
Processed via AUI System:   Date: __/__/__  Time: ___
AUI Input By: ___
Notification to Accounting:   Copy □

**Accounting / Wire Department Use ONLY**
Correspondent Bank Info (Foreign WT's ONLY)
Please Call to Correspondent Bank:   Date: __/__/__  Time: ___
Correspondent Bank Routing # : ___
Correspondent Bank Name: ___
Correspondent Bank Contact: ___
Correspondent Bank Reference / Sequence # ___
Intermediary Bank Routing # : ___
Intermediary Bank Name: ___
Additional Info: ___

86

# FIDELITY

## OUTGOING - WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

Date: 11.10.10

Type of WT:

Requested By: City Provider AZ

Beneficiary Institution: 709

Benef. Reference #13

**Fidelity Bank Requesting Customer / Originator / Sender:** JONATHAN ROSE

Spoke to: ___   Yes ☐   No ☐

**Beneficiary / Receiving Bank**

ABA Routing / Swift #: 12102342

Bank Name: WELLS FARGO

Bank Address / Location: 2650 W. Horizon Ridge
HENDERSON NV 89052
701-616-3459

**Beneficiary / Receiver of WT**

Beneficiary Name: Hilton Consulting
Address: 1505 ANTHEM VILLAGE
HENDERSON NV 89052

Beneficiary Account Number: 3979806340

**Wire / Funds Transfer Dollar Amount:** $99,500.00

**Accounting / Wire Department Use ONLY**

**WT Authorization & Input**

CIP/IC Verification By: ___   Date: __/__/__   Time: ___

Proceed to FRB: ___

WT Execution Approval: ___

WT Input to FRB By: ___

WT Verified / Executed to FRB By: ___

WT Supervisory Review: ___

Processed to JH / Register: ___   Date: __/__/__   Time: ___

Processed to JH By: ___   Time: ___   JH Response Code: ___

Notification to Accounting: Copy ☐

/// FIDELITY

# OUTGOING - WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

Date: 1.11.11   Time: 11:40 AM

Type of WT:   U.S. Funds   Foreign Funds   Amount $ 21.00
Prepared By: Guy & Prokovich #13

Benefit/Fund Available:   ☑
Requesting WT Documentation Attached:
Additional Info:

Call Back Time:
Call Back Required:
Verified By:

Spoke to:   Yes ☐   No ☑

**Fidelity Bank Requesting Customer / Originator / Sender**
Fidelity Contact Name: JONATHAN ROJE

**Beneficiary / Receiving Bank**
ABA Routing # / Swift #: 121000242
Bank Name: WELLS FARGO
Bank Address / City / State: 2650 W HORIZON RIDGE
HENDERSON NV. P9052
702-616-2442
Bank Short/Complete Name:

**Beneficiary / Receiver of WT**
Beneficiary Name: LHO P CONSULTING
Address: 2505 ANTHEM VILLAGE
HENDERSON NV P9052
39790 6240.

Beneficiary Account Number:

For Further Credit / For Final Credit / FI on FI Info / Originator to Beneficiary Info:

**Wire / Funds Transfer Order / Amount: $ | 4,000.00**

Type of Foreign Currency: $ _____

---

**WT Authorization & Input**

OFAC Verified By: _____
Passed to FRB: _____ Date ___/___/___
WT Executive Approval: _____
WT Input to FRB By: _____
WT Verified / Execed to FRB By: _____
WT Repetitive Review: _____
WT Repetitive Review: _____ One ___/___/___ Task _____
Passed on At If System: One ___/___/___ JH Registers Code
Additional Info:
Additional to Accounting:   Copy ☐

**Accounting / Wire Department Use ONLY**

**Correspondent Bank Info (Foreign WTs ONLY)**
Phone Call to Correspondent Bank:   Date ___/___/___ Time _____
Correspondent Bank Routing # : _____
Correspondent Bank Name : _____
Correspondent Bank Center : _____
Correspondent Bank Reference / Sequence # : _____
Intermediary Bank Name : _____
Intermediary Bank Info : _____
Additional Info : _____

WT Instructions:
For Further Credit / For Final Credit / FI on FI Info / Originator to Beneficiary Info:

88

# FIDELITY

## OUTGOING - WIRE / FUNDS TRANSFER

**Requesting Branch Department**

Date: 1.14.11   Time: 9.42.19

Type of WT: U.S. Dom. ☑   (Internat'l ☐) feet 2: 22

Requested For: Gov 50 (Recv'd) Branch 13

Beneficiary Information:

Sending WT Documentation Amount: 4

Additional Info:

Call Back time:
Call Back performed by:

Fidelity Customer Name: JONATHAN ROSE

Fidelity Bank Requesting Customer / Originator / Sender

Wire / Funds Transfer Order Amount: $ 4,000 00

Type of Foreign Country:

**Beneficiary / Receiving Bank**

ABA Routing # / Credit: 12100042

Bank Name: WELLS FARGO

Bank Address / Branch: 265A W. Heritage R.100E

Henderson, NV p0052

702-676-2460

Bank Swift/Telegraph Name:

**Beneficiary / Receiver of WT**

Beneficiary Name: LHOT COUNCIL6

Address: 0505 ANTHEM VILLAGE

Henderson, NV p0052

Beneficiary Account Number: 3079062420

WT Instructions
For Further Credit / Final Credit / FI to FI Info / Originator to Beneficiary Info:

---

**Accounting / Wire Department Use ONLY**

Please Call to Compl'd / wired Bank   Date:   Time:

Correspondent Bank Routing #

Correspondent Bank Swift:

(Intermediary Bank C...tion)

(Correspondent Bank to Beneficiary 'ic/given or b...

(Special)

Upon ...ting Bank Routing #

Upon ...ting Bank Swift #

Additional Info:

**WT Authorization & Input**

OFAC Verification By:   Date:   Type:

Received to FPB:   Date:

Received to FPB Approved:

WT Customer Approved:

WT Input to FPB #:   @ (difference : ...de)

WT Verified - Date or k-i-t #   By:   ...ypon-o-di

WT Summary Done:   By:

Post send-on-JH System   By:   Upon-July Ruffl-233# #

(p1 Input By:   ...pon-July Ruffl 233# #

Notification Fe Fe ...-d   Copy [ ]

# FIDELITY

## OUTGOING - WIRE / FUNDS TRANSFER

**Requesting Branch / Department**

Date: 1.22.11   Time: 9:45 AM

Type of WT:   U.S. Domestic ☒   Foreign ☐   Time: 22.00   Post: 13

Prepared By: Guy Cox Chouette

Beneficiary Authorization: 6/27

Supporting WT Documentation attached?   Yes ☐   No ☒

Call back done:

Call back performed by:                    Spoke to:

Fidelity Customer Type:   Fidelity Bank Requesting Customer / Originator / Sender

JONATHAN RISE

Type of Foreign Currency:

Wire if funds Transfer Dollar Amount: $ 22,000.00

**Beneficiary / Receiving Bank**

ABA Routing #/Swift #:   121 000 2 48
Bank Name:   WELLS FARGO
Bank Address / Branch Info:   2650 W. HORIZON RIDGE
HENDERSON NV PRG52
701616 3425P

Bank Short/Telegraph Name:

**Beneficiary / Receiver of WT**

Beneficiary Name:   HALCON ULTIMG
Address:   595 ANTHEM VILLAGE
HENDERSON, NV 29052
Beneficiary Account Number:   397 906 2420

WT Instructions
For Further Credit (Final Credit if FI to FI wire i) Originator to Beneficiary Info.

---

**WT Authorization & Input**

**Accounting / Wire Department Use ONLY**

Phone Call - Correspondence Rec'd   Date   Time

Correspondent Bank Routing #:

Correspondent Bank Name:

Wire posted in Bank / Correct

Wire posted in Bank / Reviewer 1

in-wrap/Bank Reviewer 2

Completed / Funds Signer

**Correspondent Bank Info (Foreign WTS ONLY)**

# EXHIBIT 5



Gonet Conseils Finances S.A.
6, Boulevard du Théâtre
CH-1211 Geneva 11
contact tel +41 (0)22 317 66 22
see means for call team
fax tel +41 (0)22 317 66 20
www.gonet.ch

**MPD MANAGEMENT INC**
**45 ST. MARTINS LANE**
**LONDON WC2N 4HX**

**MICHAEL ENRIQUEZ**
**BN: JONATHAN D. ROSE/**
**JESUS ENRIQUEZ**

### Account Summary

| | |
|---|---|
| Opening Balance | 26,813,700.32 |
| Payments In | 1,570,000.00 |
| Payments Out | 0.00 |
| Closing Balance | 26,383,700.32 |

**03 October to 03 November**

International Bank Account Number
00024261-034

Branch Identifier Code
GSW001

| Sortcode | Account Number |
|---|---|
| DJSDWU | 745912 |

## Your Business Current Account Details

| Date | Payment type and details | | Paid out | Paid in | Balance |
|---|---|---|---|---|---|
| 03 OCT | | BALANCE BROUGHT FORWARD | | | 26,813,700.32 |
| 11 OCT | CR | WIREIN/7428928DBW.NAMB46 2846█████████-020749762 | | 275,000.00 | 27,088,700.32 |
| | CR | WIREIN/20102401004;ORG J███████████; REF DCD OF 10/10/11 0501400171 | | 125,000.00 | 27,213,700.32 |
| 15 OCT | CR | WIREIN/201021603115;ORG-██████████████████ GROUP 0600900675 | | 225,000.00 | 27,438,700.32 |
| 17 OCT | CR | WIREIN/201023501966; ORG-█████████████-0501200301 | | 700,000.00 | 28,138,700.32 |
| 22 OCT | CR | WIREIN/201011800473; ORG J███████████ REF TOH OF 10/10/22 050160069 | | 100,000.00 | 28,238,700.32 |
| | CR | WIREIN/201023070704413; ORG ████████████ 1501000635 | | 70,000.00 | 28,308,700.32 |
| 25 OCT | CR | WIREIN/201031905031; ORG J██████████; REF FW0045131902805 | | 75,000.00 | 28,383,700.32 |
| ENDING BALANCE ON 03 NOV | | | | | 28,383,700.32 |
| TOTALS | | | | 1,570,000.00 | |

The Ending Daily Balance does not reflect any pending withdraws or hold on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient funds when a transaction posted, fees may have been assessed.

File = GD62E129   (114) fra = 2
PieceID = 030391   Sheet Seq = 0057728
divat = 0   Sheet 0001 of 0001



91

# EXHIBIT 6

# MJ Moore & Company, LLC

February 14, 2011                    Via E-mail                    Hardcopy via UPS

Doctor Jonathan D. Rose, M.D., Ph.D.
694 Rudgate
Bloomfield Hills, MI 48304

                              Re:     Disbursement Agent Agreement

Dear Dr. Rose;

This letter is to confirm the nature of our engagement. We have been engaged to handle the domestic disbursement of an international wire transfer expected to settle into one of our disbursement accounts at Wells Fargo Bank, N.A. within the next several days. The inbound wire is anticipated to be in the amount of Two Million Two Hundred Thousand Dollars (US$2,200,000). As soon as Wells Fargo will permit, we have been instructed to immediately send a Two Million Dollar (US$2,000,000) wire transfer to your account at Fidelity Bank in Allen Park, Michigan. We expect your wire to credit to your account and be available for withdrawal no later than Friday, February 18, 2011.

We pray this correctly sets forth your understanding of the scope of our engagement to act as disbursement agent.

Sincerely,

MJ Moore
Managing Member

92

# EXHIBIT 7

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF

## MODELOBSESSION, LLC

This Operating Agreement (this "**Agreement**") is entered into as of this ___ day of May, 2007, by Kim Mizuno ("**Mizuno**"), Jesus Enriquez ("**Enriquez**") and Diversified Technology Fund, LLC ("**DTF**") (each such person or entity and any other person or entity admitted as a member of the Company pursuant to Section 13 hereof individually referred to herein as a "**Member**" and collectively as the "**Members**"), which Members do hereby form a limited liability company pursuant to the New York Limited Liability Company Law (the "**LLCL**") upon the following terms and conditions:

1. <u>Name</u>.   The name of the limited liability company formed hereby is ModelObsession, LLC (the "**Company**").

2. <u>Purpose</u>.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the LLCL and engaging in any and all activities necessary or incidental to the foregoing.  The Company, and the Members on behalf of the Company within the limits provided for in this Agreement or the Articles of Organization, may enter into and perform any and all agreements consistent with the purpose of the Company.

3. <u>Members</u>.   The names of the initial Members are set forth above in the preamble to this Agreement.  The organizer of the Company shall be Bryan Caisse.

4. <u>Capital Structure, Initial Share Allocations and Issuance of New Shares</u>.  Interests in the Company shall be held in the form of two classes of shares: Class A shares and Class B shares.  At the time of formation, there will be allocated a total of ninety-nine (99) shares, sixty-six (66) Class A shares, which are to be allocated, thirty-three (33) each, to Mizuno and Enriquez; and thirty-three (33) Class B shares, which are to be allocated to DTF.  Each share shall represent an individisible one-ninety-ninth interest in the Company, and each share will be entitled to one-ninety-ninth of all distributions made by the Company.  No new shares shall be issued without the consent of the holders of the majority of each class of shares.

5. <u>Annual Budget and Business Plan</u>  At the time of signing of this Agreement, the Company's initial 6-month budget plan (the "**Initial Budget**") and initial business plan (the "**Initial Business Plan**"), attached hereto as Exhibit A and Exhibit B, respectively, will go into effect, to expire at midnight at the last moment of the year on New Year's Eve, 2007.  At least once annually, beginning in 2007, during the final quarter of the calendar year, the Board of Directors (described in Section 7, below) shall meet (either in person or telephonically, or shall agree unanimously in writing without meeting) and propose to the Class A and Class B shareholders the next year's annual budget and annual business plan.  During the final quarter of the calendar year, the shareholders shall meet (either in person or telephonically, or shall agree unanimously in writing without meeting) to discuss the proposed annual budget and annual business plan.  If the majority of each of the Class A and of the Class B shareholders approves

the proposed budget and the proposed business plan for the following year (the "**Approved Annual Budget**" and "**Approved Business Plan**", respectively) these will come into force at the stroke of midnight on New Year's Eve, when the previous year's Approved Annual Budget and Approved Business Plan expire. If the shareholders do not agree on one or the other, the existing Approved Annual Budget and/or Approved Business Plan, as applicable, will continue in effect, without adjustment, until agreement is reached on a new budget and/or business plan. The Approved Annual Budget and/or the Approved Business Plan may be modified from time to time over the course of the calendar year by a vote of the Board of Directors and ratification by a majority of each of the Class A and the Class B shareholders.

6. <u>Discretionary Spending Limits</u>. The Approved Annual Budget and Approved Business Plan may contain grants of discretionary accounts up to a certain amount to be under the control of the Artistic Director (as defined below) and/or the Manager (as defined below). However, any single expenditure from any such discretionary account exceeding five thousand dollars ($5000.00) shall require the approval of a majority of each of the Class A and Class B shareholders, and the aggregate unbudgeted discretionary spending for the year shall not exceed twelve-thousand dollars ($12,000.00).

7. _Board of Directors. The business and affairs of the Company shall be managed under the direction of the Board of Directors. The Board of Directors shall consist of three (3) Directors. The Class A shareholders shall have the right to appoint two (2) Directors (the "Class A Directors"), the Class B shareholders shall have the right to appoint one (1) Director (the "Class B Director"). The initial appointments by the Class A shareholders, the and the Class B shareholders are as follows:

Class A Directors          Class B Director
Kim Mizuno                 Bryan Caisse

Jesus Enriquez

(a)      Actions Requiring Affirmative Vote of a Majority of the Board of Directors. The affirmative vote of a majority of the board shall be required for the following actions:

(i)      propose the budget for each calendar year to the shareholders for approval (the Initial Budget with respect to calendar year 2007 attached hereto as Schedule A);

(ii)      propose the business plan for each calendar year to the shareholders for approval (the Initial Business Plan with respect to calendar year 2007 attached hereto as Schedule B);

(iii)      approving expenditures not included in the Approved Annual Budget;

(iv)     approving the hiring and firing of key employees of the Company;

(v)     approving the annual and quarterly financial statements, and all press releases of the Company;

(vi)     proposing the issuance of additional membership interests in the form of shares of the Company to the shareholders for approval, which such approval shall require the majority of the votes of each of the Class A and of the Class B shareholders;

(vii)     authorizing the Company to incur or assume indebtedness whether or not in the ordinary course of business;

(viii)     approving capital expenditures of the Company in excess of $10,000;

(ix)     authorizing the Company to enter into any lease for real property;

(x)     proposing amendments to this Agreement or any other organizational document of the Company to the shareholders for approval, which such approval shall require the majority of the votes of each of the Class A and of the Class B shareholders;

(xi)     authorizing the sale or other disposition (in one or a series of transactions) of assets of the Company other than in the ordinary course of the business;

(xii)     authorizing distributions of cash or other property available for distribution;

(xiii)     authorizing the Company to mortgage, pledge, assign in trust or otherwise encumber any property or assets of the Company;

(xiv)     authorizing the merger, combination or consolidation of the Company;

(xv)     authorizing the commencement of a voluntary bankruptcy by the Company, or consenting to the appointment of a receiver, liquidator, assignee, custodian, or trustee for the purposes of winding up the affairs of the Company;

(xvi)     causing the Company to engage in a public offering of its debt or equity securities; and

-3-

(xvii)   authorizing the compromise or settlement of any lawsuit, administrative matter or other dispute where the amount the Company may recover or be obligated to pay, as applicable, is in excess of $5,000.

Management Powers.   Subject to the decisions of the Board of Directors, the terms and limitations of the Approved Annual Budget, the Approved Annual Business Plan, the Articles of Organization and this Agreement, the day-to-day management of the Company shall be undertaken by a manager (the "**Manager**") who shall have the power to do any and all acts necessary or convenient in or for the furtherance of the purposes defined by the Board of Directors and the Approved Annual Business Plan.

(b)   The initial Manager of the Company shall be Jesus Enriquez

(c)   Bryan Caisse, or such person as the Board of Directors   shall designate as attorney-in-fact for this purpose, is hereby designated or approved as an authorized person, within the meaning of the LLCL, to execute, deliver and file the Articles of Organization of the Company (and any amendments and/or restatements thereof) and any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business or to act on behalf of the Company.

(d)   The Manager may be removed by a vote of the majority of the Board of Directors, or by a vote of the majority of the shareholders of the Company.

8. Artistic Management Powers.   Subject to the decisions of the Board of Directors, the terms and limitations of the Approved Annual Budget, the Approved Annual Business Plan, the Articles of Organization and this Agreement, the day-to-day artistic direction of the Company shall be undertaken by an artistic director (the "**Artistic Director**") who shall have the power to make all decisions concerning artistic matters of a technical nature (such as, for example, the layout of the site, or a relaxation of limits on the types of material to published on the site). The Artistic Director of the Company shall be Mizuno.

9. Dissolution. The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (a) the written consent of each of the Members; (b) the death, retirement, resignation, expulsion, bankruptcy or dissolution of any Member or the occurrence of any other event which terminates the continued membership of any Member in the Company if, within 90 days of any such event, the Members owning more than 50% of each of the Class A and Class B shares agree to the dissolution of the Company; or (c) the entry of a decree of judicial dissolution under Section 702 of the LLCL

10. Initial Contributions and Non-Competition Agreements.

(a) DTF shall initially contribute a total of fifty-thousand dollars ($50,000.00) to the Company, and shall make subsequent contributions, on a monthly basis, of

-4-

96

the amount of money necessary to meet the monthly budget for the first six (6) months of operation, on the following basis: no payment of dividends shall be made to any class of shareholders during the first six months of operations, and all income shall be used to pay the budgeted expenses of the Company as described in the Initial Budget.  To the extent that additional funds are needed to meet the requirements of the Initial Budget, DTF shall provide those funds.   In consideration for its contributions DTF shall receive the initial allocation of thiry-three (33) Class B shares as described in Section 4, above, at the moment of formation of the Company.

(b) Mizuno shall contribute all of his rights in all pictures, electronic images, drawings or other representations of the human body ("**Images**") made for the Company, and shall permanently and irrevocably relinquish all personal rights thereto, including all future royalty streams therefrom. He shall also contribute into the Company the model paysites and "rookie camp" currently possessed and operated by MZ Productions. Mizuno hereby agrees that he will not setup or work for any websites which broadcast Images on the internet or undertake activities which compete with the Company in any way, except that Mizuno may continue to produce Images for Playboy, which shall be governed by the agreement between Mizuno and Playboy (a current copy of which will Mizuno will provide to the Company, and which he will update in the records of the Company to the extent that his agreement with Playboy changes), and also MZ may continue to produce calendars for MZ Productions and use the MZ Productions website to present his portfolio (provided, however, that MZ Productions shall be prohibited from becoming an internet pay-site in the future). In exchange for his contribution, Mizuno shall receive thirty-three (33) Class A shares as of the moment of formation of the Company.

(c) Enriquez shall contribute his time, expertise, connections in the industry, and use of his house on an ongoing basis to the Company. He hereby agrees not to acquire an interest in or become involved in the management of any enterprise, other than the Company, which produces or distributes Images anywhere in the world. To the extent Enriquez currently possesses any such interests, he agrees that he will divest himself of such interests by the time of the formation of the Company, or that he will contribute all such interests as he retains to the Company. In exchange for his contribution, Enriquez shall receive thirty-three (33) class A shares at the time of formation of the Company.

11. <u>Capital Accounts</u>.  Each Member shall have a capital account determined and maintained in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

12. <u>Additional Contributions</u>.  With the approval of a majority of each of the Class A and Class B shareholders at either the annual meeting of shareholders or in a special meeting of shareholders called for this purpose, the Company may initiate a capital call, obliging each shareholder to pay in the amount and within the timeframe agreed upon at said shareholders' meeting, provided that such time to pay shall not be less than twenty (20) business days from the date of receipt of notice of such capital call by the shareholders. If a shareholder fails to make a required capital call, the Company shall force the sale of the shareholders shares to the company at a price of one hundred dollars ($100.00) per share.  Any such shares repurchased by the Company shall then be offered first to shareholders of the same class of

shares as were repurchased by the Company (for example: in the event of a forced sale of Class B shares for failure to make a capital call payment, the Class B shares acquired by the Company shall be first offered to the Class B shareholders) and second, if there are no interested purchasers of the same class of shareholders, to the other class of shareholders. The sale of forced repurchased shares to other shareholders shall be by auction, on a share-by-share basis, with each share being bid upon separately (thus, a bidder may bid upon just one share and is not required to bid upon all of the shares offered for sale). The minimum price opening bid shall be the per-share capital call amount plus one-hundred ($100.00).

13. <u>Allocation of Profits, Losses, and Distributions</u>. The Company's profits and losses shall be allocated to the Members on the basis of a per-share pro-rata division of the operating profits or losses. Each share, of either Class A or Class B, shall be entitled to a one-ninety-ninth share of operating profits, to be distributed as provided in the Operating Agreement.

14. <u>Alienability of Shares</u>.

(a) Their initial allotment of thirty-three (33) Class A shares each represent artistic and managerial control of the Company and as such, each shall be the personal property of Mizuno and Enriquez, respectively. Accordingly, Class A shares may not be not be transferred, alienated or hypothecated in any way to any other person without the agreement of a majority of each of the Class A and class Class B shareholders. Class A shares are not inheritable or devisable. In the event of the death or long-term incapacity of a Class A shareholder, his or her shares shall be appraised and purchased by MO.

(b) The initial allotment of thirty-three (33) Class B shares to DTF represents a capital contribution with only very limited powers of control over the Company. Accordingly, Class B shares are freely transferable, devisable and inheritable. However, in the event that a Class B shareholder intends to transfer any class B share or shares, each Class A shareholder must be notified by Class B shareholders thirty (30) calendar days prior to any such sale or transfer, and the Class A shareholders, individually or as a group, shall have the right of first refusal, whereby they may choose to purchase the Class B shares on the same terms as the Class B shares were to be sold to the third party purchaser(s).

15. <u>Forced Sale</u>. Class A shareholder(s) may force a sale of Class B shares by sending a written notice of forced sale ("**Forced Sale Notice**") to all of the Class B shareholders stating the price at which the Class A shareholder(s) invoking forced sale will purchase the entirety of all Class B shareholders interests. The Forced Sale Notice must be addressed to all Class B shareholders, and the Class A shareholder(s) forcing a sale must purchase all outstanding Class B shares from all Class B shareholders.

Within 30 New York City business days following receipt of the Forced Sale Notice, the class B shareholder(s) may accept the forced sale, do nothing, or send a notice countering the forced sale to the Class A shareholder initiating the forced sale ("Forced Sale Counter Notice"). The Forced Sale Counter Notice must be received by the Class A shareholder(s) within 30 calendar days of the date of receipt of the Forced Sale Notice by the

-6-

98

Class B shareholder(s) (Notice of receipt by registered or certified US Mail or US Mail return receipt, or notice of delivery by courier service shall constitute proof of delivery and establish the date of receipt.) By the Forced Sale Counter Notice, the Class B shareholder(s) notify the Class A Shareholder(s) who initiated the forced sale of the intention of the Class B shareholders to acquire the entirety of the shares of those Class A shareholders (only) who initiated the forced sale, at the price stated by the Class A shareholder(s) in their Forced Sale Notice. Within 30 New York business days after receipt of the Forced Sale Counter Notice by the affected Class A shareholder(s), the Class B shareholder(s) must complete the purchase of the notified Class A shareholder(s) shares.

   16. <u>Liability of Members</u>.  The Members shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the LLCL

   17. <u>Key Person Insurance</u>.  The Manager shall obtain and keep in force at all times a minimum of five-hundred thousand dollars ($500,000.00) of life insurance on the life of Kim Mizuno, which insurance shall, in the event of his death, be paid to the Company.

   18.  <u>**Governing Law and Forum Selection**</u>.  **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED UNDER, THE LAWS OF THE STATE OF NEW YORK, WITH ALL RIGHTS AND REMEDIES BEING GOVERNED BY SAID LAWS.  IN THE EVENT OF LITIGATION BETWEEN MEMBERS, EACH MEMBER AGREES THAT THE FEDERAL COURTS IN THE SOUTHERN DISTRICT OF NEW YORK ("SDNY") SHALL BE THE EXCLUSIVE JURISDICTION IN WHICH ANY SUCH DISPUTE IS RESOLVED.  IF FOR ANY REASON THE SDNY IS NOT PERMITTED TO HEAR THE CASE, THEN THE PARTIES AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF OF THE COURTS OF GENERAL JURISDICTION LOCATED IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN THE STATE OF NEW YORK**

   19. <u>Binding Arbitration</u>.  To avoid the expense and delay of litigation, the Members agree that all unresolvable conflicts between the Members of whatever kind shall first be submitted to mediation, which shall occur within the Borough of Manhattan in New York City.  If mediation should fail to resolve the differences between the Members, each agrees to submit the dispute, of whatever kind whatsoever, to binding arbitration, which shall be conducted within the Borough of Manhattan in New York City.

   20. <u>Tax Treatment</u>.  The Members agree to treat the Company as a partnership for tax purposes.  DTF shall serve as the initial "tax matters partner" of the Company within the meaning of Section 6231(a)(7) of the Internal Revenue Code of 1986, as amended.

   21. <u>Waiver or Amendment</u>.  No waiver or amendment of any provision of this Agreement shall be valid or of any force or effect, unless made by an instrument in writing, signed by all of the Members, setting forth the exact nature of such waiver or amendment.

22. <u>Counterparts</u>.   This Agreement may be executed or subscribed to in counterparts, all of which together shall constitute one agreement binding on all parties hereto notwithstanding that all of the parties have not signed the same counterpart.

IN WITNESS WHEREOF, the undersigned has duly executed this Agreement as of the day and year first above written.

_____
Kim Mizuno

_____
Jesus Enriquez

_____
Bryan Caisse
Managing Member,
Diversified Technology Fund, LLC

-8-

100

# EXHIBIT A

## INITIAL APPROVED ANNUAL BUDGET

101

# EXHIBIT B

## INITIAL BUSINESS PLAN

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Dean D. Pregerson and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV11- 7838 DDP  (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=============================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

**COPY**

Nicholas A. Rozansky (SBN 219855)
EZRA BRUTZKUS GUBNER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
(818) 827-9000

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JONATHAN D. ROSE, M.D., PH.D., an individual,

PLAINTIFF(S)

v.

MICHAEL ENRIQUEZ, an individual, JESUS ENRIQUEZ, an individual,
MPD MANAGEMENT,. INC., a Nevada corporation dba LHOP
CONSULTING, KIM MIZUNO, an individual, and DOES 1-10, inclusive

DEFENDANT(S).

CASE NUMBER

CV 11-7838-DDP(AJWx)

**SUMMONS**

TO:   DEFENDANT(S): MICHAEL ENRIQUEZ, an individual, JESUS ENRIQUEZ, an individual, MPD MANAGEMENT,
                     Continued on attachment
      A lawsuit has been filed against you.

        Within 21_____ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached X complicate _____ amended complaint
        counterclaim     cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer
or motion must be served on the plaintiff's attorney, Nicholas A. Rozansky (SBN 219855)_____ , whose address is
21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367_____ . If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint. You also must file
your answer or motion with the court.

                                        Clerk, U.S. District Court

Dated: September 22, 2011_____                By: MARILYN DAVIS
                                                    SEAL
                                                    Deputy Clerk

                                                    (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed
60 days by Rule 12(a)(3)].*

1    Attachment to Summons

2  INC., a Nevada corporation dba LHOP CONSULTING, KIM MIZUNO, an individual,

3  DOES 1-10, inclusive

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

AO 72
(Rev. 8/82)

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

JONATHAN D. ROSE, M.D., PH.D., an individual

**DEFENDANTS**

MICHAEL ENRIQUEZ, an individual, JESUS ENRIQUEZ, an individual, MPD MANAGEMENT, INC., a Nevada corporation dba LHOP CONSULTING, KIM MIZUNO, an individual, and DOES 1-10, inclusive

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

EZRA BRUTZKUS GUBNER LLP
21650 Oxnard St., 5th Floor
Woodland Hills, CA 91367  818-827-9000

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff      ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant      ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No       ☒ **MONEY DEMANDED IN COMPLAINT:** $ 3,606,267.54

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☒ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/ PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | | | |

## CV11-7838

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                         CIVIL COVER SHEET                         Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No  ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                                ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                                ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                                ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Jonathan D. Rose, M.D., Ph.D. - Los Angeles | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Michael Enriquez - County of Los Angeles<br>Kim Mizuno - County of Los Angeles | Jesus Enriquez - County of Bexar, State of Texas<br>MPD Management, Inc. - North Clark County, State of Nevada |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____   Date  September 22, 2011

**Notice to Counsel/Parties:**   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |